## IN THE SUPREME COURT OF THE STATE OF IDAHO

### Docket No. 36231-2009

| | | |
|---|---|---|
| VIKING CONSTRUCTION, INC., an Idaho corporation, | ) ) ) | Moscow, April 2010 Term |
| Plaintiff-Appellant, | ) ) | 2010 Opinion No. 56 |
| v. | ) ) | Filed: May 28, 2010 |
| HAYDEN LAKE IRRIGATION DISTRICT, an Idaho quasi-municipal corporation, | ) ) ) | Stephen W. Kenyon, Clerk |
| Defendant-Respondent. | ) ) | |

Appeal from the District Court of the First Judicial District of the State of Idaho, in and for Kootenai County. The Hon. John P. Luster, District Judge.

The judgment of the district court is <u>vacated</u>.

Scott L. Rose, Boise, for appellant.

James, Vernon & Weeks, P.A., Coeur d'Alene, for respondent. Susan P. Weeks argued.

---

EISMANN, Chief Justice.

This is an appeal from a summary judgment upholding an increase in a connection fee charged as an "equity buy-in" to hook up to a domestic water system in an irrigation district. Because there is a genuine issue of material fact as to whether the connection fee was calculated as the value of that portion of the system capacity that the new user will utilize at that point in time, we vacate the judgment and remand this case for further proceedings.

### I. FACTS AND PROCEDURAL HISTORY

The Hayden Lake Irrigation District (Irrigation District) is an irrigation district that delivers both irrigation and domestic water. Viking Construction, Inc., (Viking) is a construction company that builds custom and speculation homes. It owns multiple parcels of land located within the Irrigation District.

For years, the Irrigation District has charged a fee to connect to its domestic water distribution system. A portion of the connection fee covers the actual cost of connecting to the water system, but the majority of the fee is intended to be the cost of buying an equity interest in the system.

At a regular meeting on September 7, 2004, the Irrigation District increased the connection fee from $2200 to $2700 effective the following day. Prior to the meeting, Viking had sixty-five presold homes for delivery after September 8, 2004. Viking had calculated the sale price of the homes based upon the connection fee being $2200. It asked the Irrigation District to delay the fee increase, but the District refused to do so.

On December 10, 2004, Viking filed a complaint for declaratory and injunctive relief. It sought a declaration that the Irrigation District could not charge any connection fees or could not increase the connection fee, an injunction against doing so, and a judgment for the amount of all connection fees previously paid by Viking. Both parties filed motions for summary judgment. The district court granted the Irrigation District's motion and entered judgment dismissing the complaint with prejudice. Viking then timely appealed.

## II.  ISSUES ON APPEAL

1. Did the district court err in holding that Idaho Code § 43-1909(e) authorizes the Irrigation District to impose a connection fee?

2. Did the district court err in holding that the amount of the connection fee is reasonable?

3. What does it mean that an irrigation district shall not operate its works primarily as a source of revenue to the district?

4. Must there be a constitutional provision authorizing the Irrigation District Bond Act?

5. Irrigation district statutes applicable to irrigation works may not apply to domestic water works.

6. Could the Irrigation District set the connection fee by amending its by-laws?

7. Alleged violation of the Due Process and Equal Protection Clauses of the Fourteenth Amendment.

8. Does the connection fee violate §§ 2, 4, and 5 of Article XV of the Idaho Constitution?

9. Does the connection fee violate §§ 2, 5, and 6 of Article VII of the Idaho Constitution?

2

10. Does the connection fee violate contracts between the Irrigation District and the federal government?

11. Is Viking entitled to an award of attorney fees on appeal?

## III.  ANALYSIS

**A.  Did the District Court Err in Holding that Idaho Code § 43-1909(e) Authorizes the Irrigation District to Impose a Connection Fee?**

The district court held that the connection fees were authorized by Idaho Code § 43-1909(e), which provides that the district shall have power "[t]o prescribe and collect rates, fees, tolls or charges . . . for the services, facilities and commodities furnished by works."  The court compared this provision with the identical language in Idaho Code § 50-1030(f),[1] which this Court held in *Loomis v. City of Hailey*, 119 Idaho 434, 807 P.2d 1272 (1991), authorized a city to collect a sewer and water connection fee.  Since there is no basis for giving differing constructions to the identical language in the two statutes, Idaho Code § 43-1909(e) authorizes charging a connection fee to connect to an irrigation district's domestic water system.

Viking argues that the district court erred in holding that section 43-1909(e) is applicable in this case.  That statute is part of the Irrigation District Domestic Water System Revenue Bond Act (Irrigation District Bond Act), I.C. §§ 43-1907 to 43-1920.  According to Viking, "The power granted in I.C. § 43-1909(e) is contingent on the issuance of revenue bonds, after and only after, approval of the electorate."  In support of this argument, Viking cites to remarks by legislators in the legislative record stating that the purpose of the Act was to permit irrigation districts to issue revenue bonds for domestic water systems.

"[T]he purpose of an unambiguous statute is not the concern of the courts when attempting to interpret a statute."  *In re Permit No. 36-7200 in Name of Idaho Dept. of Parks and Recreation*, 121 Idaho 819, 824, 828 P.2d 848, 853 (1992).  The asserted purpose for enacting the legislation cannot modify its plain meaning.  The scope of the legislation can be broader than the primary purpose for enacting it.  "This Court has stated that when the language of a statute is definite, courts must give effect to that meaning whether or not the legislature anticipated the

---

[1] The applicable portion of Idaho Code § 50-1030(f) granted any city the power "[t]o prescribe and collect rates, fees, tolls or charges . . . for the services, facilities and commodities furnished by such works."

3

statute's result." *Id.* We do not construe a statute unless its wording is ambiguous. As we stated in *State v. Schwartz*, 139 Idaho 360, 362, 79 P.3d 719, 721 (2003) (emphasis added, citations omitted):

> The interpretation of a statute is a question of law over which we exercise free review. It must begin with the literal words of the statute; those words must be given their plain, usual, and ordinary meaning; and the statute must be construed as a whole. *If the statute is not ambiguous, this Court does not construe it, but simply follows the law as written.* Unless the result is palpably absurd, we must assume that the legislature means what is clearly stated in the statute. If the statute as written is socially or otherwise unsound, the power to correct it is legislative, not judicial.

Viking has not pointed to any ambiguity in Idaho Code § 43-1909.[2] The statute begins, "In addition to the powers which it may now have, any district shall have power under and

---

[2] The statute provides as follows:

> In addition to the powers which it may now have, any district shall have power under and subject to the following provisions:
>
> (a) To acquire by gift or purchase and to construct, reconstruct, improve, better or extend any works within or without the district, or partially within or partially without the district, or within any part of the district, and acquire by gift or purchase lands or rights in lands or water rights in connection therewith, including easements, rights of way, contract rights, leases, franchises, approaches, dams and reservoirs; to lease any portion of the excess or surplus capacity of any such works to any party located within or without the district, subject to the following conditions: that the capacity shall be returned or replaced by the lessee when and as needed by the district for the purposes set forth in section 43-1907, Idaho Code, as determined by the district; that the district shall not be made subject to any debt or liability thereby; and the district shall not pledge any of its faith or credit in aid to such lessee;
>
> (b) To exercise the right of eminent domain for any of the works, purposes or use provided by this act, in like manner and to the same extent as provided in section 7-720, Idaho Code;
>
> (c) To operate and maintain any works within or without the boundaries of the district, or partially within or without the boundaries of the district, or within any part of the district;
>
> (d) To issue its revenue bonds hereunder to finance, in whole or in part, the cost of the acquisition, construction, reconstruction, improvement, betterment or extension of any works;
>
> (e) To prescribe and collect rates, fees, tolls or charges, including the levy or assessment of such rates, fees, tolls or charges against governmental units, departments or agencies, including the state of Idaho and its subdivisions, for the services, facilities and commodities furnished by works, and to provide methods of collections and penalties, including denial of service for nonpayment of the rates, fees, tolls or charges;
>
> (f) To pledge an amount of revenue from works (including improvement, betterment or extensions thereto, thereafter constructed or acquired) sufficient to pay bonds and interest as the same shall become due, and to create and maintain reasonable reserves therefor. Such amount may consist of all or any part or portion of the revenues. In determining the cost, there may be included all costs and estimated costs of the issuance of bonds, all engineering, inspection, fiscal and legal expenses and interest which it is estimated will accrue during the construction period and for six (6) months thereafter on money borrowed or which it is estimated will be borrowed pursuant to the irrigation district domestic water system revenue bond act; and

4

subject to the following provisions." It applies to *any* district. By its terms, it is not limited to a district issuing bonds, as are, for example, Idaho Code §§ 43-1911 and 43-1912, respectively begin with the wording "The directors of the district issuing bonds pursuant to this act" and "Any district issuing bonds under this act."

Viking also contends that the words "under and subject to the following provisions" limit the powers granted by Idaho Code § 43-1909 to irrigation districts that have issued revenue bonds. According to Viking, because the power granted is "under and subject to" subsections (a) through (g), "[t]he Act clearly demonstrates the legislature's express intention for a comprehensive plan." Thus, Viking's argument is that an irrigation district must exercise all of the listed powers, or it cannot exercise any of them. Viking cites no authority for so construing a statute such as section 43-909 that lists powers granted by the legislature, nor is such construction logical. The statute lists powers that any district may exercise. There is nothing in the language of the statute requiring an irrigation district to exercise all of the powers in order to exercise any of them. If that were the proper construction, in order to "operate and maintain any works," I.C. § 43-1909(c), the district would also have to "exercise the right of eminent domain," I.C. § 43-1909(b), and to "issue its revenue bonds," I.C. § 43-1909(d), regardless of whether it desired to acquire more property or finance a project. The district court did not err in holding that Idaho Code § 43-1909(e) applies to the Irrigation District even though it has not issued revenue bonds.

**B. Did the District Court Err in Holding that the Amount of the Connection Fee Is Reasonable?**

**1. Did the district court err in holding that the connection fee was imposed under the Irrigation District's proprietary function?** Viking argued to the district court that the connection fee had to be either a regulatory fee or a tax. Because the connection fee does not bear a reasonable relationship to the cost of enforcing any regulation, Viking asserted that it was not a regulatory fee, and therefore it could only be a tax. The district court rejected that argument based upon *Loomis v. City of Hailey*, 119 Idaho 434, 807 P.2d 1272 (1991). *Loomis*

---

(g) To issue bonds for the purpose of refunding any bonds theretofore issued under authority of the irrigation district domestic water system revenue bond act and to pay accrued interest and applicable redemption premiums on the bonds to be refunded, pursuant to and in the manner provided by section 57-504, Idaho Code.

recognized three categories of authority that could possibly be applicable and held that the connection fee was neither a tax nor a regulatory fee, but was a fee imposed pursuant to the city's proprietary function.

The *Loomis* Court began its analysis by stating, "First, we must determine whether the connection fee constitutes an impermissible tax." *Id*. at 437, 807 P.2d at 1275. The Court stated that the connection fees would not be construed as taxes if either "the rates, fees and charges conform to the statutory scheme set forth in the Idaho Revenue Bond Act or [they] are imposed pursuant to a valid police power." *Id*. at 438, 807 P.2d at 1276. "However, if the rates, fees and charges are imposed primarily for revenue raising purposes they are in essence disguised taxes and subject to legislative approval and authority." *Id*.[3]

The *Loomis* Court then addressed whether the connection fee was imposed pursuant to the city's police power. It stated, "Municipalities may impose fees pursuant to its 'police powers' to enact regulations for the furtherance of the public health, safety or morals. It is well established that fees imposed under this 'police power' must bear some reasonable relationship to the cost of enforcing the regulation." *Id*. at 437, 807 P.2d at 1275.

Finally, the *Loomis* Court addressed the city's power to impose the connection fees under its proprietary function. "Pursuant to this proprietary function municipalities may construct and maintain certain public works. . . . It is pursuant to [the Idaho Revenue Bond] Act and a municipality's proprietary function that the City of Hailey derives its authority to charge water and sewer connection fees." *Id*. at 437-38, 807 P.2d at 1275-76.

Thus, this Court held in *Loomis* that the city imposed the connection fee pursuant to its proprietary function, not pursuant to its police power.[4] The same reasoning applies here. The district court did not err in holding that the Irrigation District was exercising its proprietary function when it imposed the connection fee.

---

[3] Article VII, § 6, of the Idaho Constitution states that the legislature can grant "any county, city, town, or other municipal corporation . . . the power to assess and collect taxes for all purposes of such corporation." "Irrigation districts have been held to be municipal corporations for the purposes of art. 7 § 6 of the Idaho Constitution . . . ." *Barker v. Wagner*, 96 Idaho 214, 217, 526 P.2d 174, 177 (1974).

[4] In *Potts Construction Co. v. North Kootenai Water District*, 141 Idaho 678, 681, 116 P.3d 8, 11 (2005), we incorrectly stated that the connection fee in *Loomis* "was upheld as a valid exercise of police power authority."

6

**2. Did the district court err in holding that the connection fee constituted an equity buy in?** The city in *Loomis* characterized the connection fee as an "equity buy-in." This Court stated that "Idaho's statutory scheme does not require a new user to 'buy in' to the system, nor does it prohibit such a program." *Loomis*, 119 Idaho at 443, 807 P.2d at 1281. The Idaho Revenue Bond Act at issue in *Loomis* permitted the city to "prescribe and collect rates, fees, tolls or charges . . . for the services, facilities and commodities furnished by such works." *Id*.; I.C. § 50-1030(f). We held that this statutory language authorized the city to charge new users of the sewer and water system a connection fee that was more than the actual cost of the physical hookup. The connection fee could include an amount equal to "the value of that portion of the system capacity that the new user will utilize at that point in time." *Loomis*, 119 Idaho at 443, 807 P.2d at 1281.

The applicable language of Idaho Code § 43-1909(e) is virtually identical to the language of the Revenue Bond Act quoted above. Section 43-1909(e) permits an irrigation district to "prescribe and collect rates, fees, tolls or charges . . . for the services, facilities and commodities furnished by works." Thus, this section permitted the Irrigation District to charge new users of the domestic water system a connection fee that included an amount equal to the value of that portion of the system capacity that the new user will utilize at that point in time.

The Irrigation District had discretion to decide what methodology to use in order to determine that value. For example, it is entitled to use replacement cost rather than historical cost as the basis of its calculations. The court's limited role is simply to determine whether the methodology used to determine the value is reasonable and not arbitrary. *Loomis*, 119 Idaho at 443-44, 807 P.2d at 1281-82. However, for the connection fee to be an equity buy-in, it must be based upon some calculation designed to determine the value of that portion of the system that the new user will be utilizing. If there is no attempt to calculate in some manner that value, then the connection fee is not an equity buy-in regardless of its label.

Viking contended below that the Irrigation District did not base the amount of the connection fee upon a determination as to the value of the system that a new user would be utilizing. The district court rejected that argument, stating, "The Board considered the current value of the existing system, the values and costs to purchase equity into comparable local water distribution systems, the water management plan of [Irrigation District] with its infrastructure needs for maintenance, and the engineer's analysis regarding system repair and replacement."

7

The methodology used by the Irrigation District determined the amount of the connection fee is an issue of fact. On summary judgment, "[a]ll disputed facts are to be construed liberally in favor of the non-moving party, and all reasonable inferences that can be drawn from the record are to be drawn in favor of the non-moving party." *Infanger v. City of Salmon*, 137 Idaho 45, 47, 44 P.3d 1100, 1102 (2002).

The Irrigation District had appointed an advisory committee that made a recommendation to the board of directors regarding increasing the connection fee. The chair of the board of directors attended the meeting at which the advisory committee determined its recommendation and presided at the board meeting that considered the advisory committee's recommendation. He testified that the advisory committee arrived at its recommendation by reviewing a "comparative analysis."

> Q. How did the advisory committee come up with the recommendation for that first to be $2,700?
> A. As I recall, there was a comparative analysis.
> Q. And comparative between what and what?
> A. Between the rates that you see there.

The comparative analysis to which the chair referred was a comparison of the amounts charged by other irrigation districts for connection fees to their domestic water systems. The chair went on to testify that neither the board of directors nor the advisory committee engaged an engineer, accountant, or any other professional to calculate the equity buy-in amount. The board of directors simply adopted the recommendation of the advisory committee.

> Q. . . . What was the rationale, then, for the board on September 7, 2004, to make that fee $2,700?
> . . . .
> THE WITNESS: We recognized that the advisory committee had spent time on this and had put input in, and we felt that that was appropriate utilization of that committee, and so we took their recommendation.
> BY MR. ROSE:
> Q. Was there any analysis done by the advisory committee on September 1, 2004 meeting regarding any calculation of buy-in or equity buy-in?
> A. I don't recall.
> . . . .
> Q. . . . Did the Hayden Lake Irrigation District board engage an engineer to calculate the – calculate a equity buy-in dollar amount?
> A. No.

8

> Q. Did the Hayden Lake Irrigation District engage an accountant to calculate an equity buy-in amount?
>
> A. No.
>
> Q. Did the Hayden Lake Irrigation District engage any professional to calculate the equity buy-in amount?
>
> . . . .
>
> A. No.
>
> Q. Okay. Did – on September 7, 2004, had the Hayden Lake Irrigation District engaged anyone to calculate the equity buy-in amount?
>
> A. They had engaged the advisory committee.
>
> Q. Had the advisory committee, on September 1, 2004, engaged anyone to calculate the equity buy-in amount that was an engineer?
>
> A. Not to my knowledge.
>
> Q. Did the advisory committee, on September 1, 2004, engage any accountant to calculate the equity buy-in amount?
>
> A. Not to my knowledge.
>
> Q. Did the Hayden Lake Irrigation District advisory committee, on September 1, 2004, calculate an equity buy-in amount?
>
> A. They used the comparative analysis, the findings of which are referenced in Exhibit 29.

The chair later testified as to other documents available to the board when it made its decision, which were a water management plan and water master reports reflecting water consumption. He testified that the Irrigation District's engineer had also provided some analysis of "what antiquated, obsolete or marginally functional areas of the district were going to or presently were substandard or inadequate for anticipated growth." This additional information may certainly reflect the District's future needs, both for water and for system repairs and improvements, but there is no evidence that any of such information was related to the applicable equity.

The chair's testimony shows that there is a genuine issue of material fact as to whether the connection fee was based upon a reasonable method of determining an amount equal to the value of that portion of the system capacity that the new user will utilize at that point in time, or whether it was simply based upon what other irrigation districts were charging. Therefore, we must vacate the grant of summary judgment. Having decided that we must vacate the judgment, we will decide additional issues raised below by Viking because they are questions of law which would still need to be decided upon remand. *Silver Creek Computers, Inc. v. Petra, Inc.*, 136 Idaho 879, 883, 42 P.3d 672, 676 (2002).

9

**C. What Does It Mean that an Irrigation District Shall Not Operate Its Works Primarily as a Source of Revenue to the District?**

Idaho Code § 43-1907 provides, "No irrigation district shall operate any works primarily as a source of revenue to the district . . . ." Viking makes various arguments that can be categorized as contending that the connection fee was imposed primarily as a source of revenue. Viking contends:

> The record reflects the primary purpose of hook-on fees was to pay for future capital assets and future improvements required due to population growth, and not for a proportionate purchase of the system's current value.

> There is nothing limiting the use of the revenue from hook-on fees.

> The board in comparison commingled hook-on fees in its general fund with assessments and tract fees violating the Act.

> In contradiction to the clear legislative mandate in I.C. § 43-1907 forbidding operating works primarily as a source of revenue to a district, the board's primary method for obtaining cash reserves is through hook-on fees. Hook-on fee revenue was banked in the general fund earmarked to be spent, and was spent on general purposes, and future improvements to and expansion of the system.

> HUD has no revenue bond principal and interest to pay which generates fees from which to accumulate reserves. The purposes for which fees may be expended under the Act first requires an irrigation district to issue revenue bonds. I.C. § 43-1912.

> The board spent the revenue without a dedicated purpose in conflict with the Act.

> According to the April 2, 2002, Minutes, "all hook up's have been going into the capital improvement fund for several months."

> What is clear is that the monies were being collected to pay for the purchase of capital assets to meet the demands of anticipated future growth benefitting all the lands within HLID's boundaries.

The Revenue Bond Act at issue in *Loomis* provided, "No city shall operate any works primarily as a source of revenue to the city . . . ." I.C. § 50-1028. If the works were operated primarily as a source of revenue to the city, then the fees collected would not be allocated and budgeted in conformity with the Act. Thus, we stated, "[I]f fees are collected under the disguise

of the Act and allocated and spent otherwise, then the fees are primarily revenue raising and will be construed as taxes." 119 Idaho at 439, 807 P.2d at 1277. The Irrigation District Bond Act includes an identical provision. Idaho Code § 43-1907 provides, "No irrigation district shall operate any works primarily as a source of revenue to the district . . . ." Thus, fees collected under this Act must also be allocated and budgeted in conformity with the Act.

In *Loomis*, operating the works "primarily as a source of revenue to the city" did not mean that the connection fee could not exceed the actual cost of the labor and materials necessary to connect to the sewer and water system. The ordinance imposing the connection fee at issue in *Loomis* stated that its intent was to "recover the costs of operating, maintaining, replacing, and depreciating the existing water and sewer systems and any extensions thereof." 119 Idaho at 444, 807 P.2d at 1282. We held that "[t]here is nothing in the ordinance that is not authorized by the Idaho Revenue Bond Act." *Id.*

What the Act prohibited was using the sewer and water works primarily as a source of revenue that the city could use for purposes other than its sewer and water system. Thus, in resolving whether the connection fees were allocated and budgeted in conformity with the Revenue Bond Act, we noted, "The proceeds of the connection fee for water and sewer service are dedicated to those systems." *Id.* at 440, 807 P.2d at 1278. The money was not used for the City's other general fund expenditures. We concluded "that under these circumstances a municipality may collect fees, rates or charges pursuant to the power granted in the Idaho Revenue Bond Act to pay for maintenance, depreciation and replacement of system components." *Id.* at 441, 807 P.2d at 1279.

In *Loomis*, we also noted that "[t]he proceeds of the connection fee for water and sewer service are dedicated to those systems. Those funds are kept in a separate, segregated account and are not *used* for general fund purposes." *Id.* at 440, 807 P.2d at 1278 (emphasis added). The important issue was not that the fees were kept in a separate, segregated account. It is that they were not *used* for city functions other than the sewer and water systems.

The powers of an irrigation district under the Irrigation District Bond Act include "to construct, reconstruct, improve, better or extend any works within or without the district" and "[t]o operate and maintain any works within or without the boundaries of the district." I.C. § 43-1909(a) & (c). Spending revenues from connection fees for these purposes would be consistent with the Act. It would not be consistent with the Act to use connection fees from the domestic

water system as a source of revenue for other district functions, such as the irrigation water system.

Viking argues that Idaho Code § 43-1912 prevents the Irrigation District from accumulating reserves with the connection fees. That statute applies to "[a]ny district issuing bonds under this act [I.C. §§ 43-1906 to 43-1920] for the acquisition, construction, reconstruction, improvement, betterment or extension of any works." I.C. § 43-1912. It provides that such districts "shall have the right to appropriate, apply or expend the revenue of the works for [five listed] purposes," one of which is to "provide a reserve for improvements to the works." I.C. § 43-1912(e). The reference to "the works" means the works for which the district issued bonds to acquire, construct, reconstruct, improve, better, or extend. Because the Irrigation District did not issue bonds under the Act, this statute has no application to this case.

The statute cannot be read as only permitting irrigation districts that did issue bonds under the Act to provide a reserve for improvements to their works. The final sentence of the statute states, "Unless and until full and adequate provision has been made for the foregoing purposes, no district shall have the right to transfer the revenue of works to its general fund." *Id*. The intent is to prevent such districts from transferring to their general funds revenues from works financed with bonds until full and adequate provision has been made for the five listed purposes, including providing the reserve for improvements to those works.

## D. Must There Be a Constitutional Provision Authorizing the Irrigation District Bond Act?

In *Loomis*, this Court stated, "The Idaho Constitution, art. 8, § 3 allows municipalities to impose rates and charges to provide revenue for public works projects, and pursuant to this section of the Constitution, the Idaho legislature enacted the Idaho Revenue Bond Act, codified at I.C. § 50-1027 through § 50-1042." 119 Idaho at 437-38, 807 P.2d at 1275-76. Viking argues that because this Court has held that Article 8, § 3, does not apply to irrigation districts, *Barker v. Wagner*, 96 Idaho 214, 218, 526 P.2d 174, 178 (1974), there is no constitutional basis for the legislature enacting Idaho Code § 43-1909(e), part of the Irrigation District Bond Act.

"Our State Constitution is a limitation, not a grant of power, and the Legislature has plenary powers in all matters, except those prohibited by the Constitution." *Rich v. Williams*, 81 Idaho 311, 323, 341 P.2d 432, 439 (1959). Article 8, § 3, is not a grant of power; it is a limitation on the power of subdivisions of the State to incur indebtedness. Therefore, there did

not need to be any constitutional provision authorizing the legislature to enact the Irrigation District Bond Act, including Idaho Code § 43-1909(e).

**E. Irrigation District Statutes Applicable to Irrigation Works May Not Apply to Domestic Water Works.**

Viking contends that the connection fee violates various statutes applicable to the construction and improvement of irrigation works in an irrigation district. Without addressing Viking's arguments, we point out the following. In 1899, the legislature adopted "An Act to Provide for the Organization and Government of Irrigation Districts and to Provide for the Acquisition of Water and Other Property and for the Distribution of Water Thereby for Irrigation and Similar Purposes." 1899 Idaho Sess. Laws 408. In 1903, it repealed that Act and adopted another in its place entitled, "An Act Relating to Irrigation Districts and to Provide for the Organization Thereof and to Provide for the Acquisition of Water and Other Property and for the Distribution of Water thereby for Irrigation Purposes and for Other and Similar Purposes." 1903 Idaho Sess. Laws 150. The latter enactment, with various amendments and additions, is still the current law.

In 1946, the legislature expanded the power of irrigation districts to permit them to contract with the United States or a state agency for the construction, operation, and maintenance of a domestic water system, I.C. §§ 43-1901 to 43-1905. Ch. 3, § 1, 1946 Idaho Sess. Laws 4 (1st Extraordinary Sess.). Then, in 1988, the legislature enacted the "Irrigation District Domestic Water System Revenue Bond Act," which further expanded the powers of irrigation districts with respect to constructing works to distribute domestic water, I.C. §§ 43-1906 to 43-1920. Ch. 299, § 1, 1988 Idaho Sess. Laws 944. Which statutes are applicable may depend upon whether the issue concerns irrigation water works, or domestic water works constructed pursuant to a contract with the federal government or a state agency, or the domestic water works governed by the "Irrigation District Domestic Water System Revenue Bond Act." In particular, a connection fee imposed under Idaho Code § 43-1909(e) is not an assessment under Idaho Code § 43-704.

**F. Could the Irrigation District Set the Connection Fee by Amending Its By-laws?**

Idaho Code § 43-304 provides that the board of directors of an irrigation district has the power "to establish equitable by-laws, rules and regulations for the distribution and use of water

13

among the owners of such land." The Irrigation District imposed the connection fee increase by amending its by-laws.

In the district court, Viking asserted, "There is no statutory authority granting a board of directors the unfettered ability to alter, amend or repeal established bylaws." On appeal, it contends that section 43-304 only grants the power to "establish" by-laws, not to amend them. It also contends that the District should not be able to impose a connection fee by amending its by-laws. Viking makes no reasoned argument as to why the code section should only empower an irrigation district to adopt an initial set of by-laws that thereafter cannot be amended, nor does it make any reasoned argument as to why the district could not use its by-laws as the mechanism for adopting and amending the connection fee. The Irrigation District had the authority to amend its by-laws and to use them to impose and amend the connection fee.

**G. Alleged Violation of the Due Process and Equal Protection Clauses of the Fourteen Amendment.**

Viking argued below that the increase in the connection fee deprived it of property without due process of law in violation of the Fourteenth Amendment. Viking does not identify the protected property interest that it was allegedly deprived when the Irrigation District increased the amount of the connection fee. "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972). "Property interests, of course, are not created by the Constitution. Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law-rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Id*. Specifically, Viking must show it has a property interest in not having the connection fee imposed or in having the prior connection fee continue without change, and it must point to something under Idaho law that creates such a property interest.

Viking also contends that the connection fee also denied it the equal protection of the law in violation of the Fourteenth Amendment. Viking can bring an equal protection claim as a "class of one" if it alleges that it "has been intentionally treated differently from others similarly

14

situated and that there is no rational basis[5] for the difference in treatment." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). Viking must show that, with respect to the connection fee increase, it has been treated differently from others that are similarly situated. "'Equal protection' . . . emphasizes disparity in treatment by a State between classes of individuals whose situations are arguably indistinguishable." *Ross v. Moffitt*, 417 U.S. 600, 609 (1974).

**H. Does the Connection Fee Violate §§ 2, 4, and 5 of Article XV of the Idaho Constitution?**

Viking contends that the connection fee violates sections 2, 4, and 5 of Article XV of the Idaho Constitution. Section 2 provides, "The right to collect rates or compensation for the use of water supplied to any county, city, or town, or water district, or the inhabitants thereof, is a franchise, and can not be exercised except by authority of and in the manner prescribed by law." There is nothing indicating that the Irrigation District has granted any person or entity a franchise to supply water to the inhabitants of the District.

Section 4 begins, "Whenever any waters have been, or shall be, appropriated or used *for agricultural purposes*, under a sale, rental, or distribution thereof, such sale, rental, or distribution shall be deemed an exclusive dedication to such use . . . ." (Emphasis added.)[6] Section 5 begins, "Whenever more than one person has settled upon, or improved land with the view of receiving water *for agricultural purposes*, under a sale, rental, or distribution thereof, as in the last preceding section of this article provided . . . ." (Emphasis added.)[7] In *Mellen v.*

---

[5] Viking has not pointed to anything indicating that a higher level of scrutiny is applicable. *See Tarbox v. Tax Comm'n*, 107 Idaho 957, 959-60, 695 P.2d 342, 344-45 (1984).

[6] Article XV, § 4, states:

> Whenever any waters have been, or shall be, appropriated or used for agricultural purposes, under a sale, rental, or distribution thereof, such sale, rental, or distribution shall be deemed an exclusive dedication to such use; and whenever such waters so dedicated shall have once been sold, rented or distributed to any person who has settled upon or improved land for agricultural purposes with the view of receiving the benefit of such water under such dedication, such person, his heirs, executors, administrators, successors, or assigns, shall not thereafter, without his consent, be deprived of the annual use of the same, when needed for domestic purposes, or to irrigate the land so settled upon or improved, upon payment therefor, and compliance with such equitable terms and conditions as to the quantity used and times of use, as may be prescribed by law.

[7] Article XV, § 5, states:

*Great Western Beet Sugar Co.*, 21 Idaho 353, 359, 122 P. 30, 31-32 (1912), we stated with respect to these two sections:

> It was clearly intended that whenever water is once appropriated by any person or corporation for use in agricultural purposes under a sale, rental or distribution, that it shall never be diverted from that use and purpose so long as there may be any demand for the water and to the extent of such demand for agricultural purposes.

There is no indication that the water in the Irrigation District's domestic water system to which Viking seeks access was appropriated or used for agricultural purposes.

## I.  Does the connection fee violate §§ 2, 5, and 6 of Article VII of the Idaho Constitution?

Viking contends that the connection fee violates sections 2, 5, and 6 of Article VII of the Idaho Constitution.  Section 2 only applies to the legislature levying taxes, and section 6 prohibits the legislature from imposing taxes "for the purpose of any county, city, town, or other municipal corporation."[8]  There is nothing in the facts indicating that the connection fee was levied by the legislature.  Therefore sections 2 and 6 clearly have no application.  Section 5 provides that "[a]ll taxes shall be uniform upon the same class of subjects within the territorial limits, of the authority levying the tax, and shall be levied and collected under general laws,

---

> Whenever more than one person has settled upon, or improved land with the view of receiving water for agricultural purposes, under a sale, rental, or distribution thereof, as in the last preceding section of this article provided, as among such persons, priority in time shall give superiority of right to the use of such water in the numerical order of such settlements or improvements; but whenever the supply of such water shall not be sufficient to meet the demands of all those desiring to use the same, such priority of right shall be subject to such reasonable limitations as to the quantity of water used and times of use as the legislature, having due regard both to such priority of right and the necessities of those subsequent in time of settlement or improvement, may by law prescribe.

[8] Article VII, § 2, states:

> The legislature shall provide such revenue as may be needful, by levying a tax by valuation, so that every person or corporation shall pay a tax in proportion to the value of his, her, or its property, except as in this article hereinafter otherwise provided.  The legislature may also impose a license tax, both upon natural persons and upon corporations, other than municipal, doing business in this state; also a per capita tax:  provided, the legislature may exempt a limited amount of improvements upon land from taxation.

Article VII, § 6, states:

> The legislature shall not impose taxes for the purpose of any county, city, town, or other municipal corporation, but may by law invest in the corporate authorities thereof, respectively, the power to assess and collect taxes for all purposes of such corporation.

which shall prescribe such regulations as shall secure a just valuation for taxation of all property, real and personal . . . ."[9]  As long as the connection fees "conform to the statutory scheme" set forth in the Irrigation District Bond Act and "are allocated and budgeted in conformity with that Act," they are not taxes.  *Loomis v. City of Hailey*, 119 Idaho 434, 438-39, 807 P.2d 1272, 1276-77 (1991).  Whether or not they conform to the statutory scheme and are allocated and budgeted in conformity with the Act are issues of fact.

**J.  Does the Connection Fee Violate Contracts Between the Irrigation District and the Federal Government?**

Viking contends that the connection fee violates contracts between the Irrigation District and the federal government.  Pursuant to the federal reclamation laws, the District entered into contracts with the United States dated February 16, 1949; April 20, 1957; March 19, 1962; and September 30, 1977, for repairs, improvements and additions to the District's irrigation works.  Viking has not shown that those contracts have any application to the District's domestic water works.

**K.  Is Viking Entitled to an Award of Attorney Fees on Appeal?**

Viking requests attorney fees on appeal pursuant to the private attorney general doctrine, 42 U.S.C. § 1988, Idaho Code § 12-117, and Idaho Code § 12-121.  To be awarded attorney fees on appeal under any of those provisions, the party must be the prevailing party on the appeal.  *Idaho Press Club, Inc. v. State Legislature of the State*, 142 Idaho 640, 646, 132 P.3d 397, 403 (2006) (private attorney general doctrine); *Nation v. State, Dept. of Correction*, 144 Idaho 177, 194, 158 P.3d 953, 970 (2007); *Rollins v. Blaine County*, 147 Idaho 729, 732, 215 P.3d 449, 452 (2009) (I.C. § 12-117); and *Rhino Metals, Inc. v. Craft*, 146 Idaho 319, 322, 193 P.3d 866, 869 (2008) (I.C. § 12-121).  Although Viking obtained a vacation of the summary judgment because there is a genuine issue of material fact, it did not prevail on all of the various other issues it

---

[9] Article VII, § 5, provides:

All taxes shall be uniform upon the same class of subjects within the territorial limits, of the authority levying the tax, and shall be levied and collected under general laws, which shall prescribe such regulations as shall secure a just valuation for taxation of all property, real and personal: provided, that the legislature may allow such exemptions from taxation from time to time as shall seem necessary and just, and all existing exemptions provided by the laws of the

raised regarding the legality of the connection fee.  Therefore, we find that both parties prevailed on appeal and will not award Viking attorney fees or court costs.

## IV.  CONCLUSION

The judgment of the district court is vacated, and this case is remanded for further proceedings that are consistent with this opinion.  We do not award court costs or attorney fees on appeal.

Justices BURDICK, J. JONES, W. JONES and HORTON **CONCUR**.

---

territory, shall continue until changed by the legislature of the state: provided further, that duplicate taxation of property for the same purpose during the same year, is hereby prohibited.