**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

---

ALLIANCE FOR PROPERTY RIGHTS
AND FISCAL RESPONSIBILITY; BRYON
REED; CARL TAYLOR; LINDA
TAYLOR; HAROLD CARLSON; RITA
CARLSON; JEFF WALBOM; JACKIE
WALBOM; TED WHITEHEAD; CAROL
WHITEHEAD; ROBERT JOHNSON; JIM
DIXON; PENNY DIXON; PAMELA
LYON; WAYNE JENSEN; ANN
JENSEN; ELMER CHERRY; SANDRA
CHERRY,

　　　　　*Plaintiffs-Appellees*,

　　　　　v.

CITY OF IDAHO FALLS; IDAHO FALLS
POWER,

　　　　　*Defendants-Appellants*.

No. 12-35800

D.C. No.
4:12-cv-00146-
BLW

OPINION

---

Appeal from the United States District Court
for the District of Idaho
B. Lynn Winmill, Chief District Judge, Presiding

Argued and Submitted
October 1, 2013—University of Idaho Law School

Filed December 31, 2013

Before: Mary M. Schroeder, Sidney R. Thomas,
and N. Randy Smith, Circuit Judges.

Opinion by Judge N.R. Smith

## SUMMARY[*]

### Civil Rights/Eminent Domain

The panel affirmed the district court's summary judgment in an action brought by property owners who had objected to the City of Idaho Falls' efforts to condemn easements over their property, located outside of the City's limits, for the purpose of constructing electric transmission lines.

The panel held that municipalities in Idaho do not have the power to exercise eminent domain extraterritorially for the purpose of constructing electric transmission lines. The panel held that as a creature of the state, the City has only those powers either expressly or impliedly granted to it. Because the power to exercise eminent domain extraterritorially for the purpose of constructing electric transmission lines (1) has not been expressly granted to the City by the state, (2) cannot be fairly implied from the powers that the City has been given by the state, and (3) is not essential to accomplishing the City's objects and purposes, the City does not have that power. The panel therefore affirmed the district court's decision denying Idaho Falls extraterritorial eminent domain power.

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**COUNSEL**

Joshua Evett (argued) and Matthew C. Parks, Elam & Burke, Boise, Idaho, for Defendants-Appellants.

Brent L. Whiting (argued), Richard A. Hearn, and Eric Lynn Olsen, Racine Olson Nye Budge & Bailey, Idaho Falls, Idaho, for Plaintiffs-Appellees.

**OPINION**

N.R. SMITH, Circuit Judge:

Municipalities in Idaho do not have the power to exercise eminent domain extraterritorially for the purpose of constructing electric transmission lines. Neither the Idaho Constitution nor the Idaho Legislature has expressly or impliedly given Idaho's cities that power. Because cities in Idaho are "creature[s] of the state," they cannot receive that power from any other source. *Caesar v. State*, 610 P.2d 517, 519 (Idaho 1980). Because the City of Idaho Falls need only provide electric power at its lowest possible cost (whatever that cost may be), it cannot claim the extraterritorial use of eminent domain is necessary to accomplish its "declared objects and purposes." *Black v. Young*, 834 P.2d 304, 310 (Idaho 1992). We therefore affirm the district court's decision denying Idaho Falls extraterritorial eminent domain power.

## UNDISPUTED FACTS & PROCEDURAL BACKGROUND

The City of Idaho Falls (the "City") owns and operates Idaho Falls Power ("IFP"), an electrical utility supplying power to approximately 22,350 residential and 3,680 commercial customers within the City. IFP's generation, transmission, and distribution systems are currently located both inside and outside the City's geographical boundary.

This litigation arose from the City's recent efforts to complete its power system expansion plan first conceived in 1972 and re-affirmed in 2007. IFP seeks to finalize the plan by (1) constructing a new substation to be located north of the City and (2) constructing transmission lines outside the City's limits to connect two existing substations. This appeal concerns only the construction of the transmission lines. The proposed route for the new lines forms a semicircle, running from the Westside Substation (located southwest of the City) around the City's north end then down to the Sugarmill Substation (located on the City's east side). The entire transmission line route travels outside the City's limits.

To construct the transmission lines along the proposed route, IFP must obtain easements for power lines over the real property of individuals residing outside of the City's limits. IFP first sought to obtain these easements by offering to purchase them from the owners of the property over which the proposed lines would travel. Some of those owners (members of the Alliance for Property Rights and Fiscal Responsibility (the "Alliance")) rejected those offers.

On March 12, 2012, the Alliance sought declaratory and injunctive relief in Idaho state court. Essentially, the Alliance

alleged that the City had threatened to condemn the easements if the members of the Alliance would not sell them.  The Alliance sought declaratory and injunctive relief, arguing that the City lacked the power to condemn property outside its boundaries for the purpose of building electric transmission lines.  The Alliance also alleged that, because the City lacked the condemnation power, any taking pursuant to that power would violate the Fourteenth Amendment Due Process Clause.

On March 22, 2012, the City removed the case to federal court.  The Alliance's Fourteenth Amendment claim provided the federal district court with subject matter jurisdiction. 28 U.S.C. §§ 1331, 1441(a).  On September 7, 2012, the district court entered summary judgment in favor of the Alliance, finding that Idaho law did not grant the City (or, by extension, IFP) the power to condemn property outside its corporate limits for the purpose of constructing electric transmission lines.  The City appealed.

## STANDARD OF REVIEW

"We review de novo the district court's grant of summary judgment." *Oswalt v. Resolute Indus., Inc.*, 642 F.3d 856, 859 (9th Cir. 2011).  We also review a district court's interpretation of Idaho law de novo. *See Arizona Elec. Power Co-op., Inc. v. Berkeley*, 59 F.3d 988, 991 (9th Cir. 1995).  In doing so, we are bound by the decisions of the Idaho Supreme Court. *Id.*  "When the state's highest court has not squarely addressed an issue, we must predict how the highest state court would decide the issue using intermediate appellate court decisions, decisions from other jurisdictions, statutes, treatises and restatements for guidance." *Glendale Assocs,*

*Ltd. v. N.L.R.B.*, 347 F.3d 1145, 1154 (9th Cir. 2003) (internal quotation marks omitted).

## DISCUSSION

## I.  Eminent Domain

In this appeal, we must determine whether the City (and, by extension, IFP) may exercise the right of eminent domain to condemn easements located outside of its boundaries for the purpose of constructing electric transmission lines. "Idaho has long recognized the proposition that a municipal corporation, as a creature of the state, possesses and exercises only those powers either expressly or impliedly granted to it." *Caesar*, 610 P.2d at 519.  Accordingly, we must review Idaho law[1] to determine whether the City has that power.

---

[1] The City argues that Article 1 § 14 of the Idaho Constitution grants it extraterritorial eminent domain power because this provision is self-executing.  However, Idaho Supreme Court precedent does not support this argument.  Article 1 § 14 requires that there be a "public use" for private land to be condemned.  The Alliance does not dispute that Article 1 § 14 "to the extent of establishing the nature of the use required has been held to be self-executing." *Bassett v. Swenson*, 5 P.2d 722, 725 (Idaho 1931).  Thus, when a court must determine whether a prospective use of land can be considered a "public use," "the nature of such use is not in any wise affected by an affirmative or negative declaration of the Legislature, or by its silence." *Blackwell Lumber Co. v. Empire Mill Co.*, 155 P. 680, 684 (Idaho 1916).  The Alliance does not dispute the general proposition that the construction of electric transmission lines is a public use.

Instead, the Alliance contends that municipalities do not have the power to exercise eminent domain extraterritorially.  Article 1 § 14 is silent on this point.  Therefore, we must look to Idaho statutes. *See Cohen v. Larson*, 867 P.2d 956, 958 (Idaho 1993) (finding Article 1 § 14 "leav[es] to the legislature . . . the task of providing the procedure for implementation"); *Blackwell Lumber*, 155 P. at 686 ("After the people in

"When interpreting state law, federal courts are bound by decisions of the state's highest court." *Berkeley*, 59 F.3d at 991. However, the Idaho Supreme Court has not specifically addressed this question in the context of the relevant statutory provisions. But it has articulated principles that guide the construction of these relevant statutes. The Idaho Supreme Court mandates that "municipal corporations have three sources of power and no others: [(1)] [p]owers granted in express words; [(2)] [p]owers fairly implied in or incident to those powers expressly granted; and [(3)] [p]owers essential to the accomplishment of the declared objects and purposes of the corporation." *Black*, 834 P.2d at 310. Reviewing each of these sources of power in turn, not one confers upon the City the power of extraterritorial eminent domain for the purpose of constructing electric transmission lines.

## A. Express Words

The City argues that two statutes expressly grant it the power of extraterritorial eminent domain: (1) Idaho's general eminent domain statutes, and (2) Idaho's Revenue Bond Act.

### 1. Idaho's General Eminent Domain Statutes

Idaho's general eminent domain statutes do not expressly grant the City the power to exercise eminent domain extraterritorially for *any* purpose. Instead, under those statutes, "[a]ny municipality at its option may exercise the

---

their Constitution had declared what are public uses, it then devolved upon the Legislature to provide a procedure for exercising the right of eminent domain or subjecting lands to such public uses."); *Potlatch Lumber Co. v. Peterson*, 88 P. 426, 432 (Idaho 1906) ("Thus by legislative enactment [Article 1 § 14] of the Constitution is made effective.").

right of eminent domain . . . for any of the uses and purposes mentioned in section 7-701." Idaho Code § 7-720.[2]  Section 7-701, in turn, specifies eleven different "public uses." *See* § 7-701(1)–(11).  Relevant here, paragraph (11) authorizes the use of eminent domain for "[e]lectric distribution and transmission lines for the delivery, furnishing, distribution, and transmission of electric current for power, lighting, heating or other purposes; and structures, facilities and equipment for the production, generation, and manufacture of electric current for power, lighting, heating or other purposes." § 7-701(11).  Significantly, neither § 7-720 nor § 7-701(11) outlines where municipalities may use their eminent domain power.

Certainly, § 7-720 does not contain any language *limiting* the exercise of the eminent domain power to within the geographic limits of a municipality.  But in the eminent domain context, the absence of such a limitation in a general grant of eminent domain power normally is not construed as an authorization to exercise the power extraterritorially.  *See* 11 McQuillin *The Law of Municipal Corporations* § 32:76 (3d ed. 2013) ("[A] municipality cannot condemn lands within the state but outside its own corporate limits unless the power has been delegated by the legislature or granted by the state constitution.  The legislature may delegate such power, as frequently has been done *in express terms*." (footnotes omitted) (emphasis added)); *see also* 26 Am. Jur. 2d *Eminent Domain* § 27 (2013) ("It may be provided for by statute that municipalities may condemn land beyond their limits. However, it has been held that a grant of power to municipal corporations to condemn 'any' land for 'any' municipal or

public purpose does not include land outside the city limits." (footnotes omitted)).  Consistent with these authorities, the Idaho Supreme Court requires that "statutes conferring the power [of eminent domain] must be strictly construed." *McKenney v. Anselmo*, 416 P.2d 509, 514 (Idaho 1966).

Moreover, the Idaho Legislature has *expressly* granted cities extraterritorial eminent domain power for purposes other than constructing electric transmission lines.  For example, § 50-320(A) grants cities the power to "exercise the right of eminent domain under the provisions of [Chapter 7]" to acquire "lands not exceeding [80] acres in [1] body *outside of the corporate limits*" for the purpose of constructing a cemetery. (emphasis added).  Likewise, § 21-401 authorizes municipalities to "acquire by . . . condemnation . . . lands either wholly or partly within or *without the boundaries or corporate limits* of" the municipality "for the purpose of constructing and maintaining aviation fields, airports, hangars and other air navigation facilities." (emphasis added).  These express grants of extraterritorial eminent domain power evidence that (1) the Idaho Legislature knows how to grant extraterritorial eminent domain power to the cities of Idaho and (2) does so expressly and for a specific purpose when it intends that the cities have that power.  Therefore, the absence of an express grant of extraterritorial eminent domain power in §§ 7-720 and 7-701(11) evidences that the Idaho legislature did *not* grant such power in the general eminent domain statutes.

### 2.  Idaho's Revenue Bond Act

Next, the City argues that Idaho's Revenue Bond Act ("RBA") grants it extraterritorial eminent domain power for

the purpose of constructing electric transmission lines.[3]
According to the City, because § 50-1030(a) ("paragraph
(a)") authorizes it to acquire land to construct transmission
lines outside the City,[4] and § 50-1030(c) ("paragraph (c)")
authorizes it to employ eminent domain "for any of the
works, purposes or uses provided by this act," it may use
eminent domain to acquire the property rights it seeks in this
case.

The text of the statute forecloses this argument.
Paragraph (c) only permits cities to exercise the power of
eminent domain "in like manner and *to the same extent* as
provided in section 7-720." (emphasis added). These words
of limitation indicate that the legislature did not intend
paragraph (c) to augment the scope of the eminent domain
power beyond what § 7-720 already permitted. As discussed,
§ 7-720 does not grant cities extraterritorial eminent domain
power, so the language in paragraph (c) precludes the RBA
from granting the City that power.

Additional statutory text also forecloses the argument.
Paragraph (a) lists specific means of acquiring property rights

---

[3] The RBA includes §§ 50-1027 to -1042. *See* § 50-1027. The City may
exercise the powers granted in the RBA, even if the City is not issuing
bonds. *See Viking Const., Inc. v. Hayden Lake Irr. Dist.*, 233 P.3d 118,
123 (Idaho 2010) (concluding, based on similar language, that analogous
revenue bond act is "not limited to a district issuing bonds"), *abrogated
on other grounds by Verska v. Saint Alphonsus Reg'l Med. Ctr.*, 265 P.3d
502, 508–09 (Idaho 2011).

[4] Paragraph (a) grants cities the power to "acquire by gift or purchase . . .
rights in lands . . . in connection [with]" the construction of "works within
or without the city." These "works" include electric transmission lines.
*See* § 50-1029(a) (defining "works" as including "electric systems");
§ 50-1029(h) (defining "electric system" to include "transmission lines").

related to the works it describes. Namely, it authorizes cities to "acquire *by gift* or *purchase* lands or rights in lands." (emphasis added). However, acquisition by "condemnation" is not listed in paragraph (a). Therefore, Idaho precedent suggests that we must assume that the legislature excluded "condemnation" from this list deliberately. *Idaho Press Club, Inc. v. State Legislature of Idaho*, 132 P.3d 397, 399 (Idaho 2006) ("[W]here a constitution or statute specifies certain things, the designation of such things excludes all others.") (quoting *Local 1494 of Int'l Ass'n of Firefighters v. City of Coeur d'Alene*, 586 P.2d 1346, 1355 (Idaho 1978)). Supporting this determination, in previous versions of the RBA, paragraph (a) *did* expressly list "eminent domain" as a means by which municipalities could acquire property outside of its boundaries. *See* 1965 Idaho Sess. Laws 795. The legislature's subsequent deletion of the term from the list forecloses the conclusion that § 50-1030 expands the scope of cities' eminent domain power.

Lastly, finding a grant of extraterritorial eminent domain power in the RBA would render redundant the (clearer) grant of such power in at least one other statutory section. Section 21-401 expressly grants Idaho municipalities the power to acquire "lands either wholly or partly within or without [their] boundaries" by "condemnation" "for the purpose of constructing and maintaining aviation fields, airports, hangars and other air navigation facilities." Similarly, the RBA identifies "airport facilities and air navigation facilities" as "works" for which paragraph (c) authorizes the use of eminent domain. *See* § 50-1029(a). If paragraph (c) grants extraterritorial eminent domain power to acquire air navigation facilities, then § 21-401 becomes a redundant grant of the same power. Idaho courts avoid such constructions. *See Verska*, 265 P.3d at 510 ("When

determining the plain meaning of a statute, effect must be given to all the words of the statute if possible, so that none will be void, superfluous, or *redundant*." (emphasis added) (internal quotation marks omitted)).

Appellants argue that paragraph (c) itself is superfluous if it does not add to the eminent domain powers that § 7-720 already grants. However, this argument incorrectly assumes that paragraph (c) could serve no purpose except for expanding the scope of the eminent domain power. Instead, paragraph (c) makes clear that eminent domain is one means of acquiring "works," and that cities may finance such acquisitions by issuing revenue bonds. *See* § 50-1030(c), (e). Without that specific authorization and with the explicit grants of power to acquire by other means in paragraph (a) (namely, by gift or purchase), there would be ambiguity as to whether the RBA authorized cities to finance eminent domain acquisitions by issuing revenue bonds. Thus, paragraph (c) is not superfluous.[5]

## B. Powers Fairly Implied or Incident to Express Powers

Even though Idaho statutes do not grant the City the express power of extraterritorial eminent domain to construct transmission lines, that power may be "fairly implied in or incident to those powers expressly granted." *Black*, 834 P.2d

---

[5] We also reject the City's reliance on the "*in pari materia*" canon of construction. *See Gooding Cnty. v. Wybenga*, 46 P.3d 18, 21 (Idaho 2002) ("Statutes are *in pari materia* if they relate to the same subject. Such statutes are construed together to effect legislative intent." (citation omitted)). Given the foregoing analysis, construing these three statutes "together" does not produce a construction favorable to the City.

at 310. In determining whether statutes imply this power, "fair, reasonable, substantial doubt[s] as to the existence of a [municipal] power" must be resolved against the City. *City of Grangeville v. Haskin*, 777 P.2d 1208, 1211 (Idaho 1989).

The City argues that its extraterritorial power of eminent domain arises by implication from (1) its general power to own property outside city limits, and (2) the powers expressly granted to it under the RBA to acquire property rights for the purpose of constructing electric utilities outside city limits.[6] We disagree.

### 1. General Power to Acquire and Use Land

The City's general power to acquire and use "lands outside [its] corporate limits" does not fairly imply that the City can use the power of eminent domain to acquire easements there. § 50-220. The City cites no authority to support the proposition that the power to acquire and use real property through voluntary means implies the power of eminent domain. The absence of any authority for the City's position gives rise to a "fair, reasonable, substantial doubt" that this power can be implied from § 50-220. *City of Grangeville*, 777 P.2d at 1211. Thus, we must conclude that

---

[6] The City also argues that the extraterritorial eminent domain power can be traced to statutes authorizing the City to buy and sell excess electrical power. However, there is, at best, a tangential connection between (1) the authorization to sell excess electrical power and (2) the authority to exercise the power of eminent domain to construct power lines to facilitate the transmission of that power within the City's system for the purpose of supplying its customers. The former does not "fairly impl[y]" the latter. *Black*, 834 P.2d at 310. Moreover, the City does not argue that it seeks to build the North Loop lines for the purpose of buying and selling power from other sources.

§ 50-220 does not grant extraterritorial eminent domain power to the City.

## 2. Power Granted under the RBA

The City also argues that its extraterritorial eminent domain power can be "fairly implied" from the power the RBA grants it to acquire "by gift or purchase lands or rights in lands" outside the City's boundaries "in connection with" the construction of transmission lines and other parts of the municipal electrical system. *See* § 50-1030(a). The City's argument appears to be that, if the City has the express power to acquire and own property outside its borders for the purpose of constructing components of its municipal electrical system, then it must also be able to use the power of eminent domain (when necessary) to make use of those extraterritorially located components. However, in context, extraterritorial eminent domain power cannot be *fairly* implied from this grant of power.

As discussed, the plain text of the statute reflects a deliberate choice by the legislature not to expand the power of eminent domain beyond the borders of a municipality in the RBA. It would contradict this intent to permit the City to make an end-run around the statutory text by acquiring property outside of its boundaries, then implying the power to use eminent domain to facilitate the City's desired use of that property. Implication of such power under these circumstances could not be considered "fair[]." *Black*, 834 P.2d at 310.

### 3. Policy Reasons Not to Imply Extraterritorial Eminent Domain Power

The Idaho Supreme Court adheres to the policy that all "fair, reasonable, substantial doubt[s] as to the existence of a [municipal] power" must be resolved against the City. *City of Grangeville*, 777 P.2d at 1211. Even if the foregoing analysis does not compel the conclusion that Idaho statutes do not grant the City the power it seeks, it at least raises such a doubt. And, under *City of Grangeville*, the existence of that doubt compels the conclusion that the City must be denied the power.

If the City has no other option for providing sufficient electricity to its growing population, then it should ask the legislature—not the courts—to expand its eminent domain power to accommodate that growth. *See Farber v. Idaho State Ins. Fund*, 208 P.3d 289, 295 (Idaho 2009) ("The arguments . . . provided to this Court would be better targeted at the Legislature, which is empowered to change existing law."), *abrogated on other grounds by Verska*, 265 P.3d 502.

### C. Powers Essential to Corporation's Declared Objects & Purposes

Finally, the City's extraterritorial power of eminent domain may be implied if having that power is "essential to the accomplishment of the declared objects and purposes of the [City]." *Black*, 834 P.2d at 310. The City argues that power to condemn easements outside of city limits is essential to accomplishing the statutory mandate to provide electrical power at the "lowest possible cost." *See* § 50-1028.

There is no basis for the City's implicit argument that the legislature intended this "lowest possible cost" mandate to effect an expansion of municipal power. In fact, the opposite is true. Use of the term "possible" implies that the City should do all within the powers it has been granted elsewhere to accomplish the objective of providing low-cost power. *See Webster's Third New International Dictionary* 1771 (1993) (defining "possible" as "falling or lying within the powers (as of performance, attainment, or conception) of an agent or activity expressed or implied"). It does not imply that the City may exceed its powers already granted in order to provide power at lower cost, or that new powers may be generated in pursuit of that objective.

The City relies on *Big Sky Paramedics, LLC v. Sagle Fire District*, 95 P.3d 53 (Idaho 2004), to support its argument; *Big Sky* is distinguishable. In *Big Sky*, the court started with the premise that § 31-1401 "grants fire districts power for '[t]he protection of property against fire and the preservation of life . . . .'" *Id.* at 54. Relying on the trial court's finding that the Sagle Fire Protection District ("SFPD") provided a quicker ambulance response to emergencies than a private competitor, the court concluded that SFPD's provision of its own ambulance services was "indispensable" to its purpose of providing for "the preservation of life." *See id.* at 55.

By contrast here, the district court did not find, as a matter of fact, that completion of the North Loop in its current configuration will enable IFP to provide power at the "lowest possible cost." Furthermore, there is nothing in the record to support that proposition. Thus, unlike in *Big Sky*, there is no factual basis for concluding that the exercise of eminent domain is "essential" to accomplishing the City's objective.

Additionally, the City relies on § 50-1028's broad mandate to provide electricity at the "lowest possible cost" to circumvent other statutory provisions that would deny the City the power it seeks.  In *Big Sky*, granting the SFPD the power to operate an ambulance service did not create such tension with other statutes.  Ultimately, we must reject the City's attempt to find in this broad mandate additional powers the legislature has not granted it elsewhere.

## II. Certification to the Idaho Supreme Court

After having lost at the district court level, the City now asks us to certify the dispositive question in this appeal to the Idaho Supreme Court.  We deny the request.  *See Micomonaco v. Washington*, 45 F.3d 316, 322 (9th Cir. 1995) ("Use of the certification procedure in any given case rests in the sound discretion of the federal court." (internal quotation marks omitted)).  "There is a presumption against certifying a question to a state supreme court after the federal district court has issued a decision.  A party should not be allowed a second chance at victory through certification by the appeals court after an adverse district court ruling." *Thompson v. Paul*, 547 F.3d 1055, 1065 (9th Cir. 2008) (internal quotation marks omitted).  To overcome that presumption, the City must demonstrate "particularly compelling reasons" why it should "be allowed a second chance at victory."  *In re Complaint of McLinn*, 744 F.2d 677, 681 (9th Cir. 1984).

The City fails to identify such "particularly compelling reasons" in this case.  The City argues that the same reasons that prompted us to certify a question in *Peter-Palican v. Northern Mariana Islands*, 673 F.3d 1013 (9th Cir. 2012), should prompt certification of the question presented in this

case. However, this case differs from *Peter-Palican* in meaningful ways.

In *Peter-Palican*, an ex-government official sued the Commonwealth of the Northern Mariana Islands after she was discharged from her cabinet-level position as Special Assistant to the Governor for Women's Affairs. *Id.* at 1015. The position of Special Assistant was created by the Commonwealth's constitution, which specified that the official holding that position "may be removed only for cause." *Id.* Thus, the case presented the question whether the "for cause" limit on removal barred the Special Assistant's removal indefinitely, i.e., even after the end of the term of the governor who appointed her. *Id.* at 1018–19. We certified that question to the Commonwealth's Supreme Court, citing both "the importance of territorial sovereignty in matters of territorial governance and the lack of clear answers in Commonwealth law" as compelling reasons warranting certification. *Id.* at 1018. Taking these principles in reverse order, neither presents itself here.

The *Peter-Palican* court concluded that Commonwealth law gave unclear answers, because there was more than one "rational construction" of the disputed constitutional provision. *See id.* at 1019. We acknowledge that one might also argue that there could be more than one *possible* construction of the statutes in this case. However, faithful application of the statutory canons of the Idaho Supreme Court compels only one conclusion—the City has not been granted extraterritorial eminent domain power for the purpose of constructing electric transmission lines.

Further, this case does not implicate Idaho state sovereignty to the same extent as the constitutional provision

at issue in *Peter-Palican* implicated the Commonwealth's territorial sovereignty. In *Peter-Palican*, we were asked to determine the meaning of a provision in the Commonwealth's constitution concerning a high-ranking government office. Because the ambiguity of the constitution could not be resolved by resorting to standard rules of construction, it would invariably require making a policy choice involving the operation of the Commonwealth's government. Moreover, whatever construction we adopted would be ossified in the territory's founding charter.

The disputed question in this case can be distinguished on both points. First, the issue involves statutory construction regarding the power of Idaho's cities to exercise their power of eminent domain. Although important, this provision does not affect the governance structure of the state. Second, we are interpreting state statutes, not the Idaho Constitution. As a result, the Idaho Legislature may change the statutes if it disagrees with our decision. Unlike in *Peter-Palican*, our holding here will not be ossified in the state constitution, requiring amendment to change or avoid. Thus, this case does not present the same compelling justifications for certification that were present in *Peter-Palican*.

Therefore, in our discretion, we deny the City's request. We can decide this case by applying principles of statutory construction that the Idaho Supreme Court has clearly enunciated. Thus, the fact that there is no Idaho Supreme Court decision directly "on point" does not constrain us.

Further, the City moved this case to federal court. There, the district court gave the City the opportunity to seek certification and noted that the likely result of the district court's decision would be an appeal to the Ninth Circuit. The

City declined the district court's invitation; it did not request certification below.  Having made the choice to "cast its lot" in the federal district court, the City—having lost there—is not entitled to "a second chance at victory" through certification. *Thompson*, 547 F.3d at 1065.

## CONCLUSION

As a "creature of the state," the City has only those powers "either expressly or impliedly granted to it." *Caesar*, 610 P.2d at 519.  Because the power to exercise eminent domain extraterritorially for the purpose of constructing electric transmission lines (1) has not been expressly granted to the City by the state, (2) cannot be fairly implied from the powers that the City has been given by the state, and (3) is not essential to accomplishing the City's objects and purposes, the City does not have that power.  *See Black* 834 P.2d at 310. The judgment of the district court is **AFFIRMED**.[7]

---

[7] On March 5, 2013, the City filed an Amended Notice of Appeal to include an appeal from the district court's order awarding attorney fees. However, the City has forfeited that issue by failing to argue the issue in any of its briefs. *See Indep. Towers of Wash. v. Washington*, 350 F.3d 925, 930 (9th Cir. 2003) (noting that the failure to properly brief an issue waives the argument).