**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

FORTINO ALVAREZ,
          *Petitioner-Appellant*,

v.

RANDY TRACY, Acting Chief
Administrator for the Gila River
Indian Department of Rehabilitation
and Supervision,
          *Respondent-Appellee*.

No. 12-15788

D.C. No.
2:08-cv-02226-
DGC

OPINION

Appeal from the United States District Court
for the District of Arizona
David G. Campbell, District Judge, Presiding

Argued and Submitted
April 15, 2013—San Francisco, California

Filed December 8, 2014

Before: Alex Kozinski, Diarmuid F. O'Scannlain,
and N. Randy Smith, Circuit Judges.

Opinion by Judge N.R. Smith;
Dissent by Judge Kozinski

## SUMMARY[*]

### Habeas Corpus

The panel affirmed the district court's denial of a habeas corpus petition brought pursuant to the Indian Civil Rights Act, 25 U.S.C. § 1303 (ICRA), and 28 U.S.C. § 2241, in which Fortino Alvarez challenged convictions and sentences imposed by the Gila River Indian Community tribal court.

The panel declined to exercise jurisdiction over Alvarez's claims and affirmed the denial of the habeas petition because Alvarez failed to exhaust his claims by bringing them first to the tribal courts, and did not demonstrate that unavailability or futility of direct appeal excuses the exhaustion requirement or that the Community's appeals process did not comply with the ICRA.

Although the Community failed to raise Alvarez's lack of direct appeal in its motion to dismiss, the panel considered the defense under *Wood v. Milyard*, 132 S. Ct. 1826 (2012), and *Granberry v. Greer*, 481 U.S. 129 (1987), and concluded that the strong comity and judicial efficiency interests at stake warrant federal abstention.

Dissenting, Judge Kozinski wrote that the majority does not live up to its solemn responsibility to appear impartial, when it forgives the Community, which was represented by counsel, for failing to raise an exhaustion defense in district court or on appeal, but holds Alvarez to his single oversight

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

of failing, while unrepresented before the Community court, to raise his jury trial and confrontation claims by way of a direct appeal. On the merits, Judge Kozinski would find that the Community violated Alvarez's right to a jury trial under ICRA by failing to inform him that he needed to request a jury, a structural error fatally undermining the conviction.

## COUNSEL

Daniel L. Kaplan (briefed and argued), Assistant Federal Public Defender, and Keith J. Hilzendeger, Research and Writing Specialist, Office of the Federal Public Defender, Phoenix, Arizona, for Petitioner-Appellant.

Linus Everling, General Counsel, and Thomas L. Murphy (briefed and argued), Deputy General Counsel, Gila River Indian Community Office of the General Counsel, Sacaton, Arizona, for Respondent-Appellee.

# OPINION

N.R. SMITH, Circuit Judge:

A petitioner's failure to exhaust a claim brought under the Indian Civil Rights Act (the "ICRA"), 25 U.S.C. § 1303, does not deprive the federal court of subject matter jurisdiction. *Iowa Mut. Ins. Co. v. LaPlante*, 480 U.S. 9, 16 n.8 (1987); *Grand Canyon Skywalk Dev., LLC v. 'SA' NYU WA Inc.*, 715 F.3d 1196, 1200 (9th Cir. 2013); *Selam v. Warm Springs Tribal Corr. Facility*, 134 F.3d 948, 953 (9th Cir. 1998). Nevertheless, exhaustion under the ICRA is a "prerequisite to a federal court's exercise of its jurisdiction." *Grand Canyon*, 715 F.3d at 1200. Accordingly, we will not address a petitioner's unexhausted claims, unless the petitioner shows that one of the doctrine's narrow exceptions applies. *Jeffredo v. Macarro*, 599 F.3d 913, 918 (9th Cir. 2009); *see also Selam*, 134 F.3d at 954.

At the outset, we note that "Indian tribes occupy a unique status under our law." *Nat'l Farmers Union Ins. Cos. v. Crow Tribe*, 471 U.S. 845, 851 (1985). They "are not bound by the United States Constitution in the exercise of their powers, including their judicial powers." *Means v. Navajo Nation*, 432 F.3d 924, 930 (9th Cir. 2005). As a result, "tribal proceedings do not afford criminal defendants the same protections as do federal proceedings." *United States v. Percy*, 250 F.3d 720, 725 (9th Cir. 2001). Although the ICRA grants many rights to tribe members, some of what we would consider our most basic rights are noticeably absent. *See, e.g.*, *id.* (Sixth Amendment right to counsel).

Habeas corpus provides the exclusive remedy by which enforcement of the ICRA can be obtained in federal court.

*See Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 66 (1978). Even when we might exercise jurisdiction in the habeas context, the "Supreme Court specifically has instructed us to require exhaustion of tribal appellate court remedies . . . because the federal policy of promoting tribal self-government encompasses the development of the entire tribal court system, including appellate courts." *Selam*, 134 F.3d at 953 (internal quotation marks omitted). At times, these considerations constrain our ability to grant a petitioner relief, even when his unexhausted claim may be meritorious in other contexts.

In the instant case, Fortino Alvarez failed to exhaust his ICRA claims by bringing them first to the tribal courts. Alvarez has not demonstrated that an exception to the exhaustion doctrine applies. Thus, we decline to exercise jurisdiction over his claims and affirm the district court's denial of his habeas petition.

## FACTS

Alvarez is an enrolled member of the Gila River Indian Community (the "Community"). In 2003, the Community charged Alvarez with assault, domestic violence, and misconduct involving a weapon (the "Charges") after Alvarez allegedly assaulted his girlfriend with a flashlight. The Community's tribal court arraigned Alvarez on the Charges during a group arraignment on July 3, 2003.

Prior to the arraignment, Alvarez received a copy of the Community's criminal complaint with an attached "Defendant's Rights" form. The Defendant's Rights form included, among others, the statement: "You have the right to appeal, if you are found 'Guilty', within a period of five

(5) business days after sentencing."**¹**   This statement was consistent with the right to appeal provided by the Gila River Indian Community Code.**²**  The Community court also read the form at the beginning of the group arraignment. Thereafter, the court asked Alvarez individually whether he had any questions about those rights.  He responded that he did not.

The Community court convicted Alvarez of the Charges after a bench trial in late-2003.  The court sentenced Alvarez to one year of imprisonment for each of the five Charges. The court also determined that Alvarez should serve the five years consecutively with other time for separate crimes for which Alvarez was convicted—bringing his total prison term to nine years.

Alvarez did not appeal his conviction or sentences.  At some point, Alvarez filed a motion for commutation of his sentence.  Although Alvarez failed to raise any ICRA claims in the motion for commutation, it is unclear whether tribal

---

**¹** The form also stated:  "You have a right to a jury trial."

**²** Section 2.1236(A) of the Gila River Indian Community Code, at the time, provided:

> The Community, or any party to a prosecution by information or complaint may appeal as prescribed in this Code.  *A defendant shall have the right to appeal his conviction or sentence in a criminal action*.  A petition for appeal must be filed within five days after the decision, order, decree, or judgment of a court, excluding Saturdays, Sundays, and holidays observed by the Community Court.

(emphasis added).

procedure allowed him to assert such grounds. In any event, the Community court denied the motion for commutation, because Alvarez's disciplinary infractions in prison made him ineligible for commutation.

In 2008, Alvarez filed a pro se habeas corpus petition (the "Petition") under 25 U.S.C. § 1303, challenging his convictions and sentences. Alvarez raised a number of alleged ICRA violations.[3] The Community moved to dismiss the Petition, arguing that Alvarez failed to exhaust his tribal remedies. The Community argued that Alvarez should have brought: (1) a motion to commute that included the ICRA claims raised in the Petition; (2) a petition for writ of habeas corpus to the Community; or (3) "a motion to correct his sentence." Both the assigned magistrate judge and the district court rejected the Community's exhaustion arguments and found that, even if a motion to commute were an available remedy, further attempts to exhaust through a second motion to commute would have been futile. The district court also concluded that the Community failed to show that tribal procedure allowed for a writ of habeas corpus or a "motion to correct" Alvarez's sentence. Neither the parties nor the lower court discussed Alvarez's failure to file a direct appeal as bearing on the exhaustion issue.

The magistrate judge recommended that the district court dismiss all of Alvarez's claims on their merits. The district

---

[3] Alvarez was not represented in any of the proceedings before the Community courts. Eventually, the federal district court granted Alvarez's motion to appoint counsel. However, we note that, in sharp contrast to *Gideon v. Wainwright*, 372 U.S. 335 (1963), the ICRA does not provide a right to appointed counsel free of charge. *See* 25 U.S.C. § 1302(a)(6); *Tom v. Sutton*, 533 F.2d 1101, 1103–04 (9th Cir. 1976).

court adopted the recommendation. Alvarez timely appealed, challenging the dismissal of his Confrontation Clause and right to jury trial claims.

## DISCUSSION

We "review *de novo* a district court's denial of a petition for writ of habeas corpus under the ICRA." *Jeffredo*, 599 F.3d at 917.

## I.

"'[A] federal court's exercise of jurisdiction over matters relating to reservation affairs can . . . impair the authority of tribal courts.'" *Selam*, 134 F.3d at 953 (quoting *Iowa Mut.*, 480 U.S. at 15) (second alteration in original). As such, "'[t]he Supreme Court's policy of nurturing tribal self-government strongly discourages federal courts from assuming jurisdiction over unexhausted claims.'" *Jeffredo*, 599 F.3d at 918 (quoting *Selam*, 134 F.3d at 953). Thus, "the court is required to 'stay its hand' until [a] party has exhausted all available tribal remedies." *Id.*

A party's failure to exhaust, however, does not deprive the federal courts of subject matter jurisdiction over the claims. *See Iowa Mut.*, 480 U.S. at 16 n.8. Two Supreme Court cases—*National Farmers* and *Iowa Mutual*—illuminate the nature of our exhaustion requirement and its exceptions. In *National Farmers*, the Supreme Court applied the exhaustion doctrine in a federal case brought by non-Indians against Indians in federal court. *See* 471 U.S. at 855–57. The non-Indian plaintiffs sought to enjoin execution of a tribal court judgment against their property. *Id.* at 848. The district court entered the injunction, concluding that the tribal court

did not have jurisdiction over non-Indians' property. *Id.* at 848–49. The Supreme Court concluded that the federal district court improperly entered the injunction, because the non-Indian plaintiffs had not raised the challenge to the tribal court's jurisdiction to the tribal court in the first instance. *Id.* at 856–57. The Court reasoned that "Congress is committed to a policy of supporting tribal self-government and self-determination." *Id.* at 856. Such policy favors allowing tribal courts "the first opportunity to evaluate the factual and legal bases for the challenge" to the tribal court's jurisdiction. *Id.*

In *Iowa Mutual*, an insurance company challenged the tribal court's jurisdiction to decide a tort case against one of the company's policyholders. 480 U.S. at 12. The tribal court held that it had jurisdiction over the claims against the non-Indian company. *Id.* The company did not appeal to the tribe's court of appeals, but filed suit in federal court. *Id.* at 12–13. The district court dismissed due to the company's failure to fully exhaust its jurisdictional challenge. The district court held that it lacked subject matter jurisdiction over the suit. *Id.* at 13. Our court affirmed. *Id.*

The Supreme Court agreed that the district court properly dismissed the company's suit for failure to exhaust. *Id.* at 19–20. However, the Court disagreed that failure to exhaust deprived the federal courts of subject matter jurisdiction. *See id.* at 16 n.8 ("[T]he exhaustion rule enunciated in *National Farmers Union* did not deprive the federal courts of subject-matter jurisdiction."). The Court concluded:

> [T]he [exhaustion] rule is analogous to principles of abstention articulated in *Colorado River Water Conservation Dist. v.*

*United States*, 424 U.S. 800, 96 S. Ct. 1236, 47 L. Ed. 2d 483 (1976): even where there is concurrent jurisdiction in both the state and federal courts, deference to state proceedings renders it appropriate for the federal courts to decline jurisdiction in certain circumstances. In *Colorado River*, as here, strong federal policy concerns favored resolution in the non federal forum.

*Id.* at 16 n.8. Accordingly, the Court applied the *National Farmers* exhaustion rule and "stay[ed] its hand in order to give the tribal court a full opportunity to determine its own jurisdiction." *Id.* at 16 (internal quotation marks omitted). The Court noted some exceptions, enumerated in *National Farmers*, to the exhaustion rule, but rejected the company's argument that an exception applied. *Id*. at 18–19. The Court remanded the case for the district court to determine whether to stay the case pending further tribal proceedings or dismiss it outright. *Id.* at 20 n.14.

Since *National Farmers* and *Iowa Mutual*, we have applied the exhaustion rule and required parties to bring challenges to tribal court jurisdiction to the tribal courts before bringing the challenge to federal court. *See, e.g.*, *Grand Canyon*, 715 F.3d at 1200–01; *Burlington N. R.R. Co. v. Crow Tribal Council*, 940 F.2d 1239, 1247 (9th Cir. 1991). In doing so, we have observed that, even though exhaustion is not a "jurisdictional prerequisite," *Iowa Mut.*, 480 U.S. at 16 n.8, exhaustion is "a prerequisite to a federal court's *exercise* of its jurisdiction," *Grand Canyon*, 715 F.3d at 1200 (emphasis added). We have also noted that some exceptions to the rule may apply under certain circumstances. *Id.*

Aside from the tribal court jurisdiction issue, we have also relied on *National Farmers* and *Iowa Mutual* to define the scope of the exhaustion rule in the ICRA/habeas context. *See Jeffredo*, 599 F.3d at 918; *Selam*, 134 F.3d at 953. In keeping with *National Farmers*, we have observed "that exhaustion of [ICRA] claims is not an inflexible requirement." *Selam*, 134 F.3d at 953 (internal quotation marks omitted). We recognize that:

> A balancing process is evident; that is weighing the need to preserve the cultural identity of the tribe by strengthening the authority of the tribal courts, against the need to immediately adjudicate alleged deprivations of individual rights. Thus this Court must determine whether exhaustion is appropriate in the case at bar.

*Id.* In light of the strong presumption against "assuming jurisdiction over unexhausted claims" in the tribal context, the balance will shift in favor of not requiring exhaustion only if one of the limited exceptions to the exhaustion doctrine applies, or if the petitioner can show that the unexhausted tribal procedure is not consistent with the ICRA. *See id.* at 953–54.

We have recognized that some of the exhaustion exceptions announced in *National Farmers* may apply in the habeas context to excuse a petitioner's failure to exhaust. *Id.* at 954. We have not required exhaustion where "the litigant was able to show either that [(1)] exhaustion would have been futile or that [(2)] the tribal court of appeals offered no adequate remedy." *Id.*

In *Selam*, we applied the exhaustion doctrine in a case very similar to Alvarez's. There, the petitioner brought a number of ICRA claims to the district court, but had previously failed to bring one of them to the tribal court of appeals. *Id.* at 953. As a result, the district court (on the magistrate judge's recommendation) refused to hear the claim. *Id.* We affirmed. *Id.* at 954. We noted the strong comity and efficiency concerns underlying the exhaustion doctrine and the need to balance those concerns against the petitioner's individual rights. *Id.* at 953. We declined to "assume jurisdiction" over the petitioner's unexhausted claim and reasoned that the petitioner was a member of the tribe, convicted for crimes committed on the reservation against other Indians. *Id.* We observed that a tribe's right to self-government "includes the right to prescribe laws applicable to tribe members and to enforce those laws by criminal sanctions." *Id.* at 953–54. As such, a member Indian "is bound to follow the procedures of the tribe if they are consistent with the [ICRA]." *Id.* at 954 (emphasis omitted). We concluded that the tribe's appellate procedures were consistent with the ICRA, because the tribe had twice informed the petitioner of his right to appeal. *Id.* We rejected the petitioner's argument that exhaustion would be futile or that the appellate process was inadequate, concluding that petitioner "demonstrated neither."[4] *Id.*

---

[4] The dissent contends that Alvarez's case is distinguishable from *Selam* because, in its view, Alvarez had no adequate remedy in tribal courts. The dissent cites two bases for distinguishing *Selam* from this case: (1) Selam was represented by counsel at trial and (2) the trial judge informed Selam of his right to appeal during sentencing. *Id.* The first point was irrelevant to our analysis in *Selam*. The second point had nothing to do with whether Selam had an adequate remedy in tribal court. *Selam*, 134 F.3d at 954 (discussing, separately, Selam's knowledge of his right to appeal and the adequacy of his remedy). We rejected Selam's argument that "exhaustion

Here, as in *Selam*, the interests of comity and efficiency convince us to decline to exercise jurisdiction over Alvarez's claims. Like the petitioner in *Selam*, Alvarez is a Community member, convicted of acts committed on the reservation against other Community members. Accordingly, the Community's right of self-government includes the right to enforce its laws against Alvarez. Alvarez, as a Community member, was required to follow Community procedure and bring an appeal within five days as prescribed by Gila River Indian Community Code § 2.1236. Alvarez does not dispute that the Defendant's Rights form was attached to his criminal complaint and read to him at his arraignment. Nor does he dispute that he acknowledged that he understood the rights set forth in the form. Yet, he failed to comply with the five-day requirement. Further, Alvarez failed to bring his claims in his motion to commute his sentence. Although we acknowledge that a motion to commute might not have been the appropriate vehicle to raise ICRA claims, this fact only highlights Alvarez's failure to bring the claims on direct appeal. As a result of this failure, the Community courts have never had an opportunity to hear Alvarez's claims and "rectify any errors it may have made." *See Selam*, 134 F.3d at 953.

Alvarez offers no explanation for his failure to exhaust by bringing his claims on direct appeal. As such, he has failed to demonstrate that direct appeal would have been futile or that the Community court of appeals would not have provided

---

would have been futile or that the tribal court of appeals offered no adequate remedy" for one reason: "*Selam* . . . demonstrated neither." *Id.* The same is true of Alvarez.

an adequate remedy.**⁵** Indeed, the record demonstrates that Community procedures allowed Alvarez to seek relief from his conviction and sentence.**⁶** Although the district court found that the futility exception applied to a motion to commute, which finding we review only for clear error, *see Grand Canyon*, 715 F.3d at 1200, it did not make a finding

---

**⁵** We acknowledge, as we did in *Selam*, that Alvarez could not now bring his claims "because tribal appellate procedure only entitled him to appeal within [five] days of his conviction." 134 F.3d at 954 n.6. This does not change our conclusion, because:

> if we were to assume jurisdiction over an unexhausted claim solely on the basis that it is now too late ("futile") for [Alvarez] to bring it, this would eviscerate the tribal court exhaustion requirement-at least in cases where parties have a limited period of time in which to file an appeal. Therefore, we decline to consider the appeal of a judgment in the tribal courts futile just because the dissatisfied party has neglected to file a timely appeal.*Id.*

**⁶** Gila River Indian Community Code § 2.1326(H) reads:

> After hearing the appeal the appellate court shall issue a ruling on its findings and may:
>
> (1) Affirm the judgment of the lower court; or
>
> (2) Order the case returned to the lower court for a new trial; or
>
> (3) Reduce the sentence imposed by the lower court; or
>
> (4) Rule that the decision of the lower court be reversed and the case dismissed.

regarding the futility of Alvarez's direct appeal. As such, there is no finding to which we owe deference on this point.

Further, Alvarez has failed to show that the Community's appeals process is not consistent with the ICRA. The Community requires that people desiring to appeal their convictions do so within five days. Although this time period is short, the time-limit is not unreasonable, and the ICRA does not require anything more of the Community.[7] Thus, because Alvarez has not demonstrated that an exhaustion exception applies or that the Community's appeals process is inconsistent with the ICRA, Alvarez has failed to overcome the strong presumption of requiring full exhaustion of tribal remedies. Therefore, we require full exhaustion in this case and are "persuad[ed] . . . not to assume jurisdiction over" Alvarez's claims. *See Selam*, 134 F.3d at 953.

## II.

Alvarez argues that we should not apply the exhaustion doctrine, because the Community did not raise Alvarez's failure to appeal in its motion to dismiss for lack of

---

[7] The dissent presents the extreme hypothetical that a tribal court could implement a five-minute (or thirty-second) time-limit to appeal and thereby forestall a prisoner's right to habeas corpus review, because the prisoner would never be able to exhaust tribal remedies. However, in such an extreme case, this court would not be bound by such a ridiculous procedure. Instead, we would be authorized to hold that such a short time-limit is contrary to ICRA § 1302(a)(8) (prohibiting deprivation of liberty without due process of law). The five day time-limit in the present case is hardly comparable to the five-minute limit raised by the dissent. Though the exact line between what is an appropriate time-limit and what is too short is difficult to determine, it is unnecessary for the determination of this case. Here, Alvarez received notice of the time-limit for appeal, and we hold that the time-limit was appropriate under the ICRA.

exhaustion. According to Alvarez, the Community waived the exhaustion defense, and our application of the doctrine would be an abuse of discretion under *Wood v. Milyard*, 132 S. Ct. 1826, 1834 (2012). We reject Alvarez's arguments. Our application of the exhaustion rule is consistent with *Wood*. Further, comity and tribal self-government concerns warrant application of the doctrine, despite the Community's failure to raise the direct appeal issue.

### A. *Wood* does not bar application of the exhaustion rule in this case.

Where a tribe fails to raise the exhaustion defense in response to a habeas petition, we may nevertheless consider the defense unless the tribe has "deliberate[ly] waive[d]" it. *See id.* at 1834. A tribe deliberately waives the nonexhaustion defense when it strategically withholds it or intentionally chooses to relinquish it. *Id.* at 1833–35. For example, in *Wood*, the Supreme Court held that the court of appeals abused its discretion where it *sua sponte* raised the statute of limitations defense in a habeas case. *Id.* at 1834. The court reasoned that the state's failure to raise the defense "did not stem from an 'inadvertent error.'" *Id.* at 1835. Rather, "the State twice informed the District Court that it [would] not challenge" the petition's timeliness. *Id.* at 1834. In doing so, the state "deliberately steered" the district court away from the statute of limitations issue and toward the merits of the petitioner's claims. *Id.* at 1835.

In this case, our application of the exhaustion doctrine does not contravene *Wood*. With regard to Alvarez's failure to appeal, there is no indication in the record that the Community deliberately waived the exhaustion defense.

Unlike the state in *Wood*, the Community challenged Alvarez's nonexhausted petition by filing a motion to dismiss.**[8]** True, the petition did not address Alvarez's failure to appeal, but this omission is quite different from the state's "strategic[] withhold[ing]" of the exhaustion defense in *Wood*, in which the state "deliberately steered" the district court away from the exhaustion issue.**[9]** *Id.* at 1834–35. And

---

**[8]** We do not, as the dissent contends, hold that "a state or tribe can only waive the defense by saying so explicitly." We simply require, as the Supreme Court does, evidence that the state or tribe "knowingly and intelligently relinquished" its exhaustion defense, as opposed to having "inadverten[tly]" overlooked it. 132 S. Ct. at 1832 n.4, 1833 (alteration in original).

**[9]** The dissent's attempt to analogize the facts of this case to *Wood* misses the mark. Given the Community's motion to dismiss for failure to exhaust, it would be illogical to conclude that the Community, like the state in *Wood*, "strategically withheld the . . . defense." *See Wood*, 132 S. Ct. at 1834. In an effort to avoid this obvious conclusion, the dissent takes a more nuanced, unsupported-by-case-law approach, arguing that the Community "strategically withheld" *one argument* that supported the failure-to-exhaust defense.

The dissent speculates—as it does so much throughout its opinion—that the Community withheld the argument that Alvarez failed to appeal, because the Community had "done everything in its power to prevent Alvarez from appealing his conviction." Dissent at 41. The problem, of course, is that this theory finds no support in the record. *See Day v. McDonough*, 547 U.S. 198, 211 (2006) ("[N]othing *in the record* suggests that the State 'strategically' withheld the defense or chose to relinquish it." (emphasis added)). Even if this theory had some basis in the record, what could the Community possibly gain by not arguing that Alvarez failed to appeal?

In *Wood*, the state intentionally relinquished its defense, because it had made a "deliberate decision to proceed straightway to the merits." *See* 132 S. Ct. at 1834. Certainly the Community did not make that same decision. After all, filing a motion to dismiss would be a rather unusual

even though federal courts commonly infer waiver from the failure to raise an issue, *Day*, 547 U.S. at 202, *Wood* instructs that the exhaustion doctrine "is founded on concerns broader than those of the parties; in particular, the doctrine fosters respectful, harmonious relations between the state and federal judiciaries." 132 S. Ct. at 1833. For that reason, in exceptional cases, *Wood* permits federal courts to raise the exhaustion defense *sua sponte* unless it has been intentionally relinquished.[10] *Id.* at 1833, 1835. There is no evidence of such an intention here.

The dissent argues that finding the Community forfeited, rather than waived, the defense is not enough, because Alvarez never had a fair opportunity to respond to our theory of the case. *See id.* at 1833–34. The record tells a different story. As the dissent acknowledges, we issued an order prior to oral argument directing that "the parties should be prepared

---

way to "deliberately steer[] the District Court away from the question and toward the merits of [the] petition." *Id.* at 1835. We find nothing in the record to support the assertion that when the Community moved to dismiss the case for failure to exhaust it intentionally relinquished the argument that Alvarez failed to appeal. This leads us to conclude that the Community's failure to raise the argument was more "inadvertent" than "deliberate."

[10] Noting the Community's failure to raise exhaustion on appeal, the dissent suggests that we should rule on the merits because "we'd be doing only what the Community asked us to do in the first place." The dissent's rationale puts the cart before the horse. The question of whether we should raise the exhaustion defense "on [our] own motion," *Wood*, 132 S. Ct. at 1834, only arises because the government failed to raise the issue on appeal. If we answered the question of whether we should raise exhaustion *sua sponte* by asking whether the government raised the issue on appeal, the answer would always be no. The dissent's logic would make the discretion prescribed by *Wood* illusory.

to address whether this court has jurisdiction over this appeal." We specifically cited 25 U.S.C. § 1303 and *Jeffredo v. Macarro*, 599 F.3d 913, 918 (9th Cir. 2010). *Id.* The only discussion of jurisdiction at that cite in *Jeffredo* establishes "that a litigant must first exhaust tribal remedies before properly bringing a petition for writ of habeas corpus." 599 F.3d at 918. Alvarez responded by filing a supplemental brief, in which he argued that "to the extent exhaustion is a component of the district court's subject-matter jurisdiction here, that requirement is satisfied."

At oral argument, the court discussed Alvarez's right to appeal with counsel for both parties. The Community argued that Alvarez had failed to exhaust his tribal remedies, because "the fact of the matter is he did not directly appeal his conviction." Alvarez's counsel responded by arguing, as the dissent argues, that the Community waived the argument that Alvarez failed to appeal. Alvarez argued (again much like the dissent) that, under the Supreme Court's decision in *Wood*, the court could not raise failure to exhaust *sua sponte*, because it had been waived rather than forfeited. This series of events convinces us that Alvarez was "accorded a fair opportunity to present his position." *Wood*, 132 S. Ct. at 1834; *see also Day*, 547 U.S. at 210–11 (requiring only "notice and a fair opportunity" to argue in favor of waiver).

## B. The interests of comity and tribal self government warrant application of the exhaustion rule.

*Granberry v. Greer*, 481 U.S. 129, 134–35 (1987), discussed in *Wood*, helps guide our discretion in determining whether to address the nonexhaustion issue. In *Granberry*, the Court rejected the petitioner's argument that a state's failure to raise the exhaustion defense barred the district court

from raising it. *Id.* at 131–32. The Court reiterated its view that "comity [is] the basis for the exhaustion doctrine." *Id.* at 134. Accordingly, in exceptional cases, courts may excuse the state's duty to raise the exhaustion defense and "determine whether the interests of comity and federalism will be better served by addressing the merits forthwith or by requiring a series of additional state and district court proceedings . . . ." *Id.*

Our own precedent indicates that cases implicating tribal sovereignty and the tribal exhaustion requirement are exceptional. In *Allstate Indemnity Corporation v. Stump*, 191 F.3d 1071 (9th Cir.), *amended* 197 F.3d 1031 (9th Cir. 1999), we recognized that, because tribal sovereignty is of critical importance, the tribal exhaustion requirement is appropriately addressed *sua sponte*. 191 F.3d at 1073 (citing *United States v. Tsosie*, 92 F.3d 1037, 1041 (10th Cir. 1996)). Indeed we have found the tribal exhaustion requirement of such import that we have enforced it even when it was not raised until after we had decided the case and issued an opinion. *See Marceau v. Blackfeet Tribal Authority*, 540 F.3d 916, 920 (9th Cir. 2008). *Granberry* itself implied that tribal exhaustion is exceptional and not subject to waiver. Though *Granberry* decided an issue pertaining to the exhaustion of *state* remedies, the Court briefly compared the state exhaustion requirement to the nature of tribal exhaustion. 481 U.S. at 130 & n.4. The comparison is revealing: the Court characterized the tribal exhaustion requirement as an "inflexible bar to consideration of the merits" that may not be waived. *Id.* Although the Court's brief discussion of tribal exhaustion is dicta, we recognize, as do our sister circuits, that it demonstrates "the *heightened* sensitivity to tribal sovereignty present in federal-tribal comity cases." *Smith v. Moffett*, 947 F.2d 442, 445 (10th Cir. 1991) (emphasis

added).[11]  Requiring exhaustion of tribal remedies not only fosters mutual respect between sovereigns in a manner similar to abstention in favor of state courts, *see Iowa Mut. Ins. Co.*, 480 U.S. at 16 n.8, but also promotes tribal self-government through the development of the tribal court system.  *Id*. at 16–17.  Thus the tribal exhaustion doctrine

---

[11] As the Tenth Circuit explained in *Smith*, tribal exhaustion is of particular importance among the abstention doctrines as, *in addition* to forwarding comity interests similar to those forwarded by respect for state courts, requiring exhaustion of tribal remedies advances Congress's interest in the development of tribal sovereignty.  947 F.2d at 445 (explaining that, in recognition of Congress's intent, the Supreme Court "assiduously advocate[s] federal abstention in favor of tribal courts").

Other circuits have also read Supreme Court precedent, including *Granberry*, to imply that the tribal exhaustion requirement is of special importance. *See Bowen v. Doyle*, 230 F.3d 525, 530 (2d Cir. 2000) (describing *Granberry*'s dicta as characterizing the tribal exhaustion rule as "an inflexible bar to consideration of the merits…by the federal court, . . . requir[ing] . . . dismiss[al] when it appears there has been a failure to exhaust"); *Duncan Energy Co. v. Three Affiliated Tribes of Ft. Berthold Reservation*, 27 F.3d 1294, 1300 (8th Cir. 1994) (approving of *Smith*'s interpretation of *Granberry*).

In *Bank One, N.A. v. Shumake*, 281 F.3d 507 (5th Cir. 2002), the Fifth Circuit found the tribal exhaustion doctrine far more powerful than the state court favoring doctrine of *Colorado River Water Conservation District v. United States*, 424 U.S. 800 (1976).  As the Fifth Circuit explained, although *Colorado River* relieves the federal courts of their "unflagging obligation" to exercise their jurisdiction only in exceptional circumstances, tribal exhaustion "subordinates the federal court's obligation to exercise its jurisdiction to the greater policy of promoting tribal self-government."  *Bank One*, 281 F.3d at 514–15.  Therefore, "*Colorado River* abstention is thus the exception to the rule, whereas tribal exhaustion is the rule rather than the exception."  *Id*. at 515.

implicates unique and "exceptional" concerns beyond those implicated in federal-state comity cases.**[12]**

Further, the Supreme Court recognized in *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 71 (1978), that respect for tribal courts is particularly important when adjudicating ICRA claims, notwithstanding that the ICRA is a federal, not tribal, law.**[13]** Not only does adjudicating ICRA claims in federal court necessarily constitute an interference with tribal autonomy and self-government, 436 U.S. at 59, but resolution of statutory issues under the ICRA will "frequently depend on questions of tribal tradition and custom which tribal forums may be in a better position to evaluate than federal courts." *Id*. at 71. We recognize that the ICRA provides the mechanism of habeas corpus to correct abuses in the administration of criminal justice. *Id.* But, even when evaluating a habeas petition, we must be mindful of our obligation to avoid "intrud[ing] needlessly on tribal self-government." *Id.*

Here, our decision to decline to assume jurisdiction over Alvarez's claims is consistent with the comity and self-

---

**[12]** The dissent argues that we are obligating federal courts to always require full exhaustion in tribal habeas cases. However, this is simply not the case. Although our holding that tribal cases are exceptional provides federal courts the ability to raise the exhaustion requirement sua sponte in tribal cases, it does not require them to do so. Instead, federal courts must examine the facts of each case and apply the balancing test used in Part I of this Opinion to determine if requiring full exhaustion is appropriate.

**[13]** Similarly, we have found that requiring tribal exhaustion is "the most appropriate action" even when a case only involves questions of federal law. *United States v. Plainbull*, 957 F.2d 724, 728 (9th Cir. 1992). As we explained in *Plainbull*, that federal law is at issue is "immaterial" when "considerations of comity require the exhaustion of tribal remedies." *Id*.

government concerns underlying the tribal exhaustion doctrine generally and its application in the ICRA context specifically. If anything, the view of Congress and the Supreme Court toward tribal courts' role in tribal self-government, discussed above, makes a stronger case for an exhaustion requirement than the federalism concerns discussed in *Wood* and *Granberry*. Accordingly, we see no reason to allow Alvarez to bypass Community procedures and proceed to federal court in the first instance. *See Selam*, 134 F.3d at 953–54; *cf. Harrington v. Richter*, 131 S. Ct. 770, 787 (2011) (explaining that, in the habeas context, one of the purposes of the exhaustion requirement is to ensure that "state proceedings are the central process, not just a preliminary step for a later federal habeas proceeding").

The nature of Alvarez's claims strengthen our conclusion and further convince us that "comity and judicial efficiency . . . make it appropriate for [us] to insist on complete exhaustion." *See Granberry*, 481 U.S. at 135. Alvarez brings his right to a jury trial claim under the ICRA, 25 U.S.C. § 1302(a)(10). Section 1302(a)(10) makes it unlawful for a tribe to "deny to any person accused of an offense punishable by imprisonment the right, upon request, to a trial by jury of not less than six persons." Alvarez acknowledges that the Community informed him of his right to a jury trial, but argues that it never told him that he had to request one. Thus, according to Alvarez, failure to request a jury trial did not constitute voluntary, knowing, and intelligent waiver of the right as required by the Constitution. *See United States v. Duarte-Higareda*, 113 F.3d 1000, 1002 (9th Cir. 1997).

We have not previously had occasion to determine the scope of a defendant's right to a jury trial under the ICRA. Federal Constitutional jurisprudence informs our

interpretation of the ICRA where the rights are the same. *See Randall v. Yakima Nation Tribal Court*, 841 F.2d 897, 900 (9th Cir. 1988). However, the rights afforded by the ICRA are not coterminous with the Constitution where the language and the history of the ICRA and the Constitution differ. *See Santa Clara Pueblo*, 436 U.S. at 62–63; *Randal v. Yakim Nation Tribal Court*, 841 F.2d 897, 900 (9th Cir. 1988) (explaining that when interpreting the ICRA's due process clause, "courts . . . [have] correctly sensed that Congress did not intend that the . . . due process principles of the Constitution disrupt settled tribal customs and traditions." (quoting F. Cohen, *Handbook of Federal Indian Law*, 670 (1982 ed.))); *Tom v. Sutton*, 533 F.2d 1101, 1103–04 (9th Cir. 1976). Because the ICRA, by its plain language, requires a defendant to request a jury, it differs significantly from the Sixth Amendment right to a jury trial. *See* 25 U.S.C. § 1302(a)(10). As such, we cannot resolve Alvarez's argument by consulting Sixth Amendment case law alone. Further, no federal court has determined whether a defendant can knowingly and voluntarily waive his right to a jury trial under the ICRA if the tribe never told the defendant that such a trial was available only "upon request." As a result, Alvarez's jury trial claim presents a significant and unresolved question of federal law.

If Alvarez had pursued his tribal remedies, it is possible that a tribal court would have granted relief, and we would not be here today. At least two other tribal courts have agreed with Alvarez's argument that a tribe must inform a defendant of his right to a jury "upon request" to satisfy the knowing and intelligent requirement. *See, e.g.*, *McGrady v. Three Affiliated Tribes*, 31 Indian L. Rep. 6058, 6058–59 (N. Plains Intertr. Ct. App. 2004); *Confederated Salish & Kootenai Tribes v. Peone*, 16 Indian L. Rep. 6136, 6136–37

(C.S. & K. Tr. Ct. 1989). Even if the Community courts did not grant Alvarez the relief he seeks, their full consideration of the issues and development of the record could have aided our decision and promoted the orderly administration of justice. *See Nat'l Farmers*, 471 U.S. at 856 (explaining that the tribal court's full development of the record would aid the federal court, even though the tribal court would be considering a question of federal law). Thus judicial efficiency considerations, as well as "our general duty to avoid deciding unnecessary issues," *Turner v. U.S. Parole Comm'n*, 810 F.2d 612, 613 n.3 (7th Cir. 1987), counsel in favor of enforcing the exhaustion requirement here.

The dissent breathlessly accuses us of treating the parties "disparate[ly]." How, the dissent asks, could we "forgive[] the Community's double-default but hold[] Alvarez strictly to his single oversight"? We too would be troubled—if this were not a gross oversimplification of the issues presented in this case. The parties' defaults were not created equal: Alvarez failed to exhaust; the Community inadvertently forfeited a defense. These doctrines are animated by wholly different rationales. Unlike forfeiture, exhaustion "implicates values beyond the concerns of the parties." *Wood*, 132 S. Ct. at 1833.

The dissent ignores this distinction by citing non-habeas, non-exhaustion, non-Indian law cases that apply waiver to support its contention that we are being inconsistent with past decisions. These cases may fit the dissent's carefully crafted narrative, but they do little to support its contention of inconsistency. Although noticeably absent from the cases

cited by the dissent, the interests of comity and tribal self-government are critical to our conclusion here.[14]

## CONCLUSION

Alvarez failed to exhaust his claims and, thereby, failed to meet this "prerequisite" of our exercise of jurisdiction. Alvarez has not shown that the unavailability or futility of direct appeal excuses the exhaustion requirement. Nor has he shown that the Community's appeals process did not comply with the ICRA. Although the Community failed to raise Alvarez's lack of direct appeal in its motion to dismiss, we nevertheless consider the defense under *Wood* and *Granberry*. The strong comity and judicial efficiency interests at stake warrant federal abstention. We, therefore, decline to assume jurisdiction over Alvarez's claims.

**AFFIRMED**.

---

[14] The dissent dismisses the comity interests at stake here because, in its view, the "Community's process seems to be designed to deny convicted defendants a fair chance to appeal." But as we have said in the context of Indian law, comity involves "respecting a sovereign's procedures and avoiding paternalism." *Bird v. Glacier Elec. Coop., Inc.*, 255 F.3d 1136, 1143 (9th Cir. 2001); *Selam*, 134 F.3d at 953–54 ("[E]xcept to the extent demanded by the [ICRA], the structure and procedure of [tribal] courts may be determined by the tribes themselves."). The dissent seems to be saying that it is willing to respect a tribe's sovereign right to order its own procedures—but only if the dissent approves of those procedures. This turns comity on its head and replaces it with the very paternalism the Supreme Court has discouraged. *See Iowa Mut. Ins. Co.*, 480 U.S. at 14–19. Indeed, the dissent sprinkles its analysis with derogatory remarks about the tribe's judicial processes, even implying that tribal judicial officials are less suited for their jobs than "marsupials." Suffice to say, we think the tribe, a sovereign nation, is more deserving of our respect.

KOZINSKI, Circuit Judge, dissenting:

When we take the judicial oath of office, we swear to "administer justice without respect to persons, and do equal right to the poor and to the rich . . . ." 28 U.S.C. § 453. I understand this to mean that we must not merely *be* impartial, but must *appear* to be impartial to a disinterested observer. Today we do not live up to this solemn responsibility. Relying on a ground not raised by either party here or in the district court, we refuse to consider petitioner's serious and, in my opinion, meritorious claims. This is only the latest indignity inflicted on a criminal defendant who, despite having a seventh-grade education, was forced to defend himself at trial; although having the right to a jury, was never told that he had to ask for one; and who was therefore convicted and sentenced to eight years in prison in a bench trial where neither the prosecution nor the judge lifted a finger to bring the accusing witness into court. He'd have had a fairer shake in a tribunal run by marsupials.

I am troubled by the disparate way we treat the parties. Alvarez and the Community both failed to raise legal issues at the proper time and in the proper manner. Alvarez failed to raise his jury trial and confrontation claims by way of a direct appeal within the tribal court; the Community failed to raise an exhaustion defense in district court. The Community committed an additional default by also failing to raise this issue on appeal—something we've repeatedly held is an independently sufficient basis for declining to address it. *See, e.g.*, *Rivera* v. *Peri & Sons Farms, Inc.*, 735 F.3d 892, 901 (9th Cir. 2013) (O'Scannlain, J.); *Alliance for Property Rights and Fiscal Responsibility* v. *City of Idaho Falls*, 742 F.3d 1100, 1110 n.7 (9th Cir. 2013) (N.R. Smith, J.); *United States* v. *Anekwu*, 695 F.3d 967, 985 (9th Cir. 2012)

(N.R. Smith, J.); *Kreisner* v. *City of San Diego*, 1 F.3d 775, 778 n.2 (9th Cir. 1993) (O'Scannlain, J.).

The majority forgives the Community's double-default but holds Alvarez strictly to his single oversight. I can't see the justice in this, but it gets worse: Alvarez committed his default when he stood before the Community court without representation. It's not clear that he was *ever* advised of a right to take an appeal. But if he was, it happened months before his trial. After he was convicted and sentenced to eight years in prison, he was not reminded of his right to appeal; he was given no notice-of-appeal form or other guidance about how to take an appeal. He was incarcerated with no ready access to legal materials and faced a 5-day filing deadline—shorter than any I've ever heard of.

The Community, by contrast, was at all times represented by competent (and presumably well-compensated) counsel. It was fully aware that failure to exhaust was a plausible defense, and raised three separate exhaustion arguments in the district court (though not the one that my colleagues are so taken with). It then chose not to argue exhaustion at all in its appeal to us.

Confronted with this checkered procedural history, we might hold both parties to their defaults. That would have an appearance of fairness. Or, we could forgive both parties their defaults, which also seems fair. But if we do either of these things, the exhaustion issue drops out, and we must rule on the merits of Alvarez's petition. The only way to reach the majority's result here is by excusing the Community's defaults while holding Alvarez strictly to his—which is just what my colleagues do.

I have read the opinion many times and disagree with pretty much everything in it, including the numerals and punctuation. I explain why in the pages that follow, but first I pose a more basic question: How can a court committed to justice, as our court surely is, reach a result in which the litigant who can afford a lawyer is forgiven its multiple defaults while the poor, uneducated, un-counseled petitioner has his feet held to the fire? I attribute no ill will or improper motive to my excellent colleagues. They are fair, honorable and dedicated jurists who are doing what they earnestly believe is right. But we see the world very differently. *See, e.g.*, *United States* v. *Pineda-Moreno*, 617 F.3d 1120, 1123 (9th Cir. 2010) (Kozinski, C.J., dissenting from denial of rehearing en banc). I can find no justification for showing such solicitude for the overdog while giving the underdog the back of the hand.

# I

Federal courts have a "virtually unflagging obligation . . . to exercise the jurisdiction given them." *Colo. River Water Conservation Dist.* v. *United States*, 424 U.S. 800, 817 (1976). Although we have recognized a limited exception to this rule when habeas petitioners fail to exhaust tribal remedies, "[t]he exhaustion requirement is not an inflexible one," but rather "is imposed to further the congressional goals of preserving and strengthening native American cultures by insuring that tribal institutions are not denied the opportunity to resolve tribal disputes or to make tribal policy." *St. Marks* v. *Chippewa-Cree Tribe of Rocky Boy Reservation, Mont.*, 545 F.2d 1188, 1189 (9th Cir. 1976) (per curiam). Accordingly, a respondent may waive a nonexhaustion defense, *see Granberry* v. *Greer*, 481 U.S. 129, 133 (1987),

and, even when the defense is preserved, we must exercise caution in relying on it.

## A

**1.**  Generally, "a [defense] is forfeited if not raised in a defendant's answer or in an amendment thereto." *Wood* v. *Milyard*, 132 S. Ct. 1826, 1832 (2012).  If the forfeiture is inadvertent, we have discretion to forgive it; but we have no authority to forgive a waiver—a deliberate bypassing of known legal theories.  *See id.* at 1833 n.5 (citing *Day* v. *McDonough*, 547 U.S. 198 (2006)); *see also id.* at 1832 n.4. The first question, then, is whether the Community's failure to raise Alvarez's nonexhaustion of direct appeals was a mere oversight, or the result of a deliberate choice.  The majority concludes it was an oversight, based on the fact that "the Community challenged Alvarez's nonexhausted petition by filing a motion to dismiss."  Maj. Op. 16–17.

I draw the opposite inference.  The Community's motion to dismiss was based on Alvarez's alleged failure to exhaust other tribal remedies, but it *omitted* any mention of Alvarez's failure to take a direct appeal.  It seems perfectly clear that the Community, counseled by its able lawyers and intimately familiar with the record in its own court, thought about exhaustion and knew it was an available defense.  The applicable maxim here is *expressio unius est exclusio alterius*.  *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 107–11.  Turning their backs on six centuries of common law experience, my colleagues invent a new maxim to fit the occasion: *expressio unius est inclusio alterius*.  What good are maxims if judges can stand them on their heads whenever it suits them?  I

rather doubt that Bryan Garner or his venerable co-author would approve of my colleagues' interpretive innovations.

The majority tries hard to squeeze support from *Wood*, but *Wood* came out the wrong way for that purpose: The Supreme Court there held that the court of appeals had abused its discretion in doing just what the majority is doing here. The only way *Wood* helps the majority is that the state there waived an exhaustion defense by expressly telling the district court that it chose not to assert the defense. *See Wood*, 132 S. Ct. at 1830–31. The majority reads *Wood* as if an affirmative statement were the *only* way a tribe could waive the exhaustion defense, but if that were the rule, the Court would have said so. Instead, it announced a far more nuanced rule: "When the State [in our case, the Community] answers a habeas corpus petition, it has a duty to advise the district court whether the prisoner has, in fact, exhausted all available [tribal] remedies." *Granberry*, 481 U.S. at 134. Where the habeas respondent fails to raise exhaustion in its "answer or in an amendment thereto," the defense is forfeited, *Wood*, 132 S. Ct. at 1832, subject to a "modest exception," *id.*, applicable only in "exceptional cases," *id.* at 1832, 1834. Addressing our situation, the Court added: "That restraint is all the more appropriate when the appellate court itself spots an issue the parties did not air below, and therefore would not have anticipated in developing their arguments on appeal." *Id.* at 1834.

The caution about "exceptional cases" and the need for "additional restraint" would have been pointless if the rule were that a state or tribe can waive the defense only by saying so explicitly. But the Court eschewed such a mechanical rule. Instead, it stuck with the long-standing proposition that, whether a claim or defense has been waived "must depend, in

each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct" of the waiving party. *Johnson* v. *Zerbst*, 304 U.S. 458, 464 (1938).

This case, in fact, presents a much closer parallel to *Wood* than the majority lets on. The state in *Wood* recognized the possibility of a statute-of-limitations defense when the district court raised the issue sua sponte; nevertheless, it "informed the District Court it would 'not challenge'" the petition on those grounds. *Wood*, 132 S. Ct. at 1830, 1832. Here, the Community recognized the availability of an exhaustion defense before the district court when it argued that Alvarez "has not raised any of the issues in his *Petition* in the Community Court in the form of a motion to correct his sentences, a motion for commutation or a habeas corpus petition," yet never said anything about Alvarez's failure to file a direct appeal.

In *Wood*, the state declined to resuscitate the statute-of-limitations defense on appeal, choosing to litigate on the merits. *Wood*, 132 S. Ct. at 1831. Here, the Community dropped even the exhaustion defenses it *did* raise below, electing to defend against Alvarez's appeal on the merits. When the appellate court in *Wood* again raised timeliness as a possible ground for dismissal and ordered supplemental briefing, the state dedicated more than two-thirds of its briefing to the merits, indicating continued reliance on its merits defense. Here, when asked to address exhaustion at oral argument, the Community again relied on Alvarez's failure to file a motion for commutation or a habeas petition, but said almost nothing about his failure to take a direct appeal.

Not only is our case closely analogous to *Wood*, it's a far cry from *Day*, where the Supreme Court found that the lower court did not abuse its discretion by raising a timeliness defense on its own motion.   547 U.S. at 203–04.   *Day* involved a mistaken concession based on an arithmetic error: The state filed a document stating that the habeas petition was timely, but this was based on a miscalculation of tolled time, an error patent on the face of the filing.   The Court described this as "merely an inadvertent error," and emphasized that "nothing in the record suggest[ed] that the State 'strategically' withheld the defense or chose to relinquish it." *Id.* at 211.   *Day*, in short, was about a mistake.

What we have here is no mistake.   It is the omission of a legal argument based on facts well known to both parties. The Community didn't absent-mindedly overlook exhaustion or miscalculate a deadline.   Failure to exhaust was part of its defense strategy and, in support thereof, it enumerated three nonexhausted tribal-court remedies.   But it never relied on Alvarez's most obvious omission: his failure to file a direct appeal.   Because we must assume that the Community has knowledge of its own remedies and filing deadlines (knowledge the majority ascribes to a man with a seventh-grade education who represented himself), this looks very much like a case where the Community "deliberately steered the District Court away from" the direct appeal issue.   *Wood*, 132 S. Ct. at 1835.   If *Wood* allows waiver by anything short of express disavowal of a defense, as it surely does, then this case is it.

**2.**  Because the Community waived a defense based on Alvarez's failure to take an appeal, we lack discretion to raise this exhaustion defense sua sponte.    But even if the Community's conduct did not amount to a waiver, we would

*still* lack discretion to consider the defense because *Wood*'s second prong is unsatisfied.

*Wood* held that only "where the petitioner is accorded a fair opportunity to present his position, may a . . . court consider the defense on its own initiative." *Wood*, 132 S. Ct. at 1833–34. Alvarez was not "accorded a fair opportunity to present his position" because he has never been presented with the majority's homespun theory. As noted, the Community did not raise a defense grounded in Alvarez's failure to exhaust direct appeals before the district court or in its briefs on appeal. So Alvarez never had a chance to state his position in the customary way—by responding to his opponent's arguments.

A week before oral argument, we issued an order alerting the parties to "be prepared to address *whether this court has jurisdiction* over this appeal," making specific reference to "25 U.S.C. § 1303 as discussed in *Jeffredo* v. *Macarro*, 599 F.3d 913, 918 (9th Cir. 2010)." Not surprisingly, the discussion at oral argument concerned whether we have jurisdiction. Whether a court *has* jurisdiction is a question far different from whether it should *exercise* jurisdiction. Both concepts have "jurisdiction" in their name but they have little else in common. Alvarez therefore had no opportunity to weigh in on issues peculiar to the exercise of jurisdiction, such as whether the Community bypassed its exhaustion argument deliberately or whether the interests of comity and efficiency weigh in favor of abstention.

If my colleagues thought we might dismiss the appeal on prudential grounds, they said nothing about it. Alvarez's lawyer had no reason to address an issue no one had raised, nor did the Community raise the point post-argument in any

of its numerous 28(j) letters. The first time Alvarez will have heard the majority's theory will be when he reads the opinion, and the first chance he will have to address it will be in his petition for rehearing. I don't think that's what the Supreme Court had in mind when it told us that a court may "consider the defense on its own initiative" only in cases "where the petitioner is accorded a fair opportunity to present his position." *Wood*, 132 S. Ct. at 1834.

An opportunity to respond is especially important because, as the majority acknowledges, whether we should decline to exercise our jurisdiction involves an entirely different inquiry than whether we have jurisdiction at all. The discretionary decision whether to exercise jurisdiction is a complex and nuanced one as to which a skilled advocate such as Alvarez's current counsel would have a great deal to say. Not only do my colleagues rush to judgment without pausing to hear Alvarez's view of the material, we have not heard the Community's position—except, perhaps, that the Community would be happy to win on whatever ground pleases the court. I find it hard to understand how the majority can be confident of its answer to this important question without any input from the parties.

Appellate courts "are particularly ill suited to consider issues forfeited below. Unlike district courts, courts of appeals cannot permit a State to amend its answer to add a defense, nor can they develop the facts that are often necessary to resolve questions of timeliness." *Wood*, 132 S. Ct. at 1836 (Thomas, J., concurring in the judgment). If there are additional facts that bear on our exercise of discretion, we're in no position to consider them. If Alvarez has arguments against the majority's view that I haven't thought of, we don't know what they are. The majority's opinion in

this case provides a cautionary tale about what happens when a court abandons the case the parties briefed and argued, and goes off based on its own pet theory.

**3.** Even if the Community's waiver had been inadvertent, and even if Alvarez had a fair opportunity to present his position, that would only *permit*—not obligate—us to consider an exhaustion argument. *Wood* makes clear that the discretion to address such unraised arguments "should [be] reserve[d] . . . for use in *exceptional cases*." *Wood*. 132 S. Ct. at 1834 (emphasis added). The Community's failure to raise Alvarez's nonexhaustion of direct appeal hardly qualifies as exceptional. It is not the result of an obvious and inadvertent error, immediately apparent to everyone once it's pointed out, as was true in *Day*. Nor is this a case where the Community would be severely prejudiced by our adjudication of the merits: Had the Community cared about exhaustion, it would at least have kept alive the exhaustion defenses it did raise in district court. Were we to rule on the merits, we'd be doing only what the Community asked us to do in the first place.

These case-specific considerations matter little to the majority, however, because it fashions a sweeping new rule: "[C]ases implicating tribal sovereignty and the tribal exhaustion requirement" are *always* "exceptional." Maj. Op. 20. In our circuit, therefore, tribes will no longer need to raise an exhaustion defense in federal habeas proceedings; we will do it for them. That's a remarkable inversion of our normal practice, and entirely inconsistent with the principles underlying *Wood*.

The majority's conclusion is drawn from a patchwork of inapplicable case-law, improper inferences and acontextual dicta. My colleagues first suggest that a tribe's blanket

immunity from our normal waiver doctrine can be derived from *Granberry*. But *Granberry* makes clear that "if a full [proceeding] has been held in the district court and it is evident that a miscarriage of justice has occurred," it is normally "appropriate for the court of appeals to hold that the nonexhaustion defense has been waived in order to avoid unnecessary delay in granting relief." 481 U.S. at 135. *Granberry* therefore directs us to at least peek at the merits of a habeas petition in order to determine whether a case is "exceptional." The majority's categorical rule—untethered from the merits of the petition or the potential injustice that denial of review may cause—plainly contravenes *Granberry*'s instruction.

Unable to find support in *Granberry*'s holding or reasoning, the majority relies on misreading the opinion's dicta. According to the majority, "the Court [in *Granberry*] characterized the tribal exhaustion requirement as an 'inflexible bar to consideration of the merits' that may not be waived." Maj Op. 20. The *Granberry* Court did no such thing. The "inflexible bar" language that the majority cites comes from the following sentence: "At the other extreme, we *might* treat nonexhaustion as an inflexible bar to consideration of the merits of the petition by the federal court." *Granberry*, 481 U.S. at 131 (emphasis added). That "extreme" option was precisely what *Granberry* rejected: "We are not persuaded by either of the extreme positions. The appellate court is not required to dismiss for nonexhaustion notwithstanding the State's failure to raise it." *Id.* at 133.

True, the "inflexible bar" language is followed by a *cf.* cite to two tribal exhaustion cases. But that's merely intended to point to an analogous area of law—tribal *civil*

cases—where the exhaustion requirement is stronger than in the habeas context. I don't understand how *Granberry*, while creating a rule that limits a court's power to sua sponte raise an exhaustion argument to only "exceptional cases," intended—through a *cf.* cite—to carve out a special exemption from that rule for tribal habeas petitioners. It's even further afield to then conclude, as the majority does, that this exemption is so powerful that tribal exhaustion arguments are *per se* unwaivable, irrespective of a petition's underlying merits—the precise result *Granberry* explicitly disclaims.

The majority tries hard to bolster its reading of *Granberry* by referencing civil cases where we have stayed actions pending exhaustion of tribal remedies. *See Marceau* v. *Blackfeet Tribal Authority*, 540 F.3d 916, 921 (9th Cir. 2008) ("[T]he district court should stay, rather than dismiss, the action against the Housing Authority while Plaintiffs exhaust their tribal court remedies"); *Allstate Indemnity Corporation* v. *Stump*, 191 F.3d 1071, 1076 (9th Cir. 1999), amended 197 F.3d 1031 (9th Cir. 1999) ("[T]he district court should stay the action while Allstate exhausts its remedies in tribal court"). But the Supreme Court has made clear that federal review through habeas corpus—the only remedy explicitly provided for in ICRA—is very different from ordinary civil litigation involving Indian tribes. *See Santa Clara Pueblo* v. *Martinez*, 436 U.S. 49, 70–71 (1978).[1] In the civil context, a

---

[1] Understanding the origins of our tribal exhaustion jurisprudence in civil cases helps explain why mechanically applying it to the habeas context is so wrong. Before the Supreme Court's 1978 decision in *Martinez*, several lower courts had implied a private right of action in federal court to enforce ICRA's "bill of rights"—Section 1302. *See, e.g.*, *Johnson* v. *Lower Elwha Tribal Cmty. of Lower Elwha Indian Reservation*, 484 F.2d 200, 201 (9th Cir. 1973). In *Martinez*, the Supreme

stringent exhaustion requirement is needed to limit excessive litigation against tribes, which may "undermine the authority of tribal forums . . . [and] impose serious financial burdens on already 'financially disadvantaged' tribes." *Id.* at 64. But ICRA's habeas provision "protect[s] the individual interests [of tribe members] while avoiding unnecessary intrusions on tribal governments." 436 U.S. at 67. That's why, when enacting ICRA, Congress struck "the balance between [its] statutory objectives . . . [by] providing only for habeas corpus relief [and not a civil remedy]." *Id.* at 66.[2] By mechanically

---

Court held that ICRA does not provide such an implied cause of action. 436 U.S. 49 at 72. But plaintiffs soon found another way to bring civil claims against tribes: "Rather than attacking [a] tribal action directly as violative of a specific provision of [ICRA], litigants began filing federal complaints alleging an absence of tribal power to engage in the challenged activity, thereby recasting the dispute as jurisdictional in nature." Laurie Reynolds, *Exhaustion of Tribal Remedies: Extolling Tribal Sovereignty While Expanding Federal Jurisdiction*, 73 N.C. L. Rev. 1089, 1100–01 (1995). The abstention doctrine articulated in *Nat'l Farmers Union Ins. Cos.* v. *Crow Tribe of Indians* was a response to the specific context of post-*Martinez* civil litigation. *See* 471 U.S. 845, 849 n.3 (1985). In *National Farmers*, "the Supreme Court agreed that these jurisdictional challenges did indeed arise under federal law for the purpose of establishing federal question jurisdiction, but instructed the lower courts to stay their hand until the litigants had exhausted their tribal remedies." Reynolds, 73 N.C. L. Rev. at 1101. There can be little doubt, therefore, that the strong abstention doctrine articulated in *National Farmers* relates only to that category of litigation affected by *Martinez*. Since *Martinez* explicitly left habeas claims untouched, it is wrong to infer that the *National Farmers* abstention doctrine is applicable to habeas.

[2] According to the majority, *Martinez* supports the conclusion that "even when evaluating a habeas petition, we must be mindful of our obligation to avoid 'intrud[ing] needlessly on tribal self-government.'" Maj. Op. 22 (quoting *Martinez*, 436 U.S. at 71). The actual context of that quote is as follows: "[G]iven Congress' desire not to intrude needlessly on tribal self-government, it is not surprising that Congress chose at this stage to

applying the exhaustion doctrine designed for civil litigation to habeas proceedings, the majority disturbs the sensitive balance between group autonomy and individual rights that Congress sought to preserve. And it goes without saying that the harm caused by *staying* a civil case pending resolution of a tribal proceeding is negligible compared to that caused by *dismissing* a prisoner's habeas petition when he has no alternative recourse.

Unsurprisingly, the majority can't find a single case in any circuit holding that a court may deny habeas relief solely on the basis of an exhaustion argument it raised sua sponte. Every case the majority cites in support of this novel proposition is a civil one. Maj. Op. 19–22. We cannot blithely import rules from the civil context to habeas, where vital liberty interests are at stake. That's doubly true in Indian law, where ICRA's habeas provision has been singled out—both by Congress and the Supreme Court—as the sole bulwark against potential "injustices perpetrated by tribal governments." *Martinez*, 436 U.S. 49 at 66 (internal quotation marks omitted). The line of non-habeas cases the majority relies on, therefore, is no foundation for a blanket exemption for tribes from our ordinary rules of waiver in the habeas context.

In a final hail mary attempt at justifying why tribal exhaustion cases are per se "exceptional," the majority invokes "our general duty to avoid deciding unnecessary issues." Maj. Op. 25 (quoting *Turner* v. *U.S. Parole Comm'n*, 810 F.2d 612, 613 n.3 (7th Cir. 1987)). But what could possibly be "unnecessary" about deciding whether

---

provide for federal review only in habeas corpus proceedings." *Martinez*, 436 U.S. at 71.

Alvarez's fundamental rights have been violated? The majority stresses that Alvarez's confrontation clause and right to jury claims present difficult and unresolved issues of federal law. Are we really to leave a man imprisoned with no remedy because we fear we're not up to the task of resolving hard legal questions? Avoidance canons do not permit us to avoid our basic duties as a court of law.

Moreover, while the majority privileges considerations of comity over Alvarez's rights at every turn, any comity interests implicated here are less than compelling because the Community's process seems to be designed to deny convicted defendants a fair chance to appeal. The Community provides only five days in which to appeal a conviction, even though many litigants, like Alvarez, lack counsel. According to Alvarez, and undisputed by the Community, the facility in which he was incarcerated had no law library, so he didn't have even the theoretical possibility of researching the law and identifying any errors in his trial or figuring out when and how to appeal them. After the trial concluded and Alvarez was sentenced, the judge did not remind him of his right to appeal or tell him when and how to exercise it.

The only time Alvarez *might* have been informed of the five-day deadline for filing his appeal was at his arraignment, nearly five months prior to his sentencing, and there's no evidence that Alvarez was given this information even then. After the Community court sentenced him, he was not given a notice-of-appeal form, provided written instructions, or told how or where to file. The Community seems to have done everything in its power to prevent Alvarez from appealing his conviction. This may, in fact, be why the Community has chosen (wisely, in my view) not to rely on failure to appeal in making its exhaustion argument.

"[I]t would be nothing less than abdication of our constitutional duty and function to rebuff petitioners with this mechanical [exhaustion] formula whenever it may become clear that the alleged state remedy is nothing but a procedural morass offering no substantial hope of relief." *Marino* v. *Ragen*, 332 U.S. 561, 564 (1947) (Rutledge, J., concurring). Such is the case here; Alvarez—and our system of justice—deserve better. Because these allegations, if borne out, would demonstrate a grave miscarriage of justice, we should not raise failure to exhaust sua sponte.

## B

Even if the Community *had* preserved its nonexhaustion defense, it is unavailing. We have observed that in evaluating such a defense, "we must first ascertain whether any meaningful tribal remedies exist, and, if so, whether exhaustion will in any way serve the purposes for which it is intended." *St. Marks*, 545 F.2d at 1189.

As we said nearly forty years ago: "That remedies are available in theory, but not in fact, is not synonymous with failure to exhaust remedies. That ineffective and meaningless procedures were available to petitioner does not preclude his seeking a writ of habeas corpus." *United States ex rel. Cobell* v. *Cobell*, 503 F.2d 790, 794 (9th Cir. 1974). The order issued by the tribal court in *Cobell* "contained no invitation to participate in tribal appellate processes," *id.* at 793–94, and neither did Alvarez's judgment of conviction. In neither our case nor *Cobell* did the trial judge explain to the losing party that he could challenge the judgment by way of an appeal.

Contrary to the majority's suggestion, *Selam* v. *Warm Springs Tribal Corr. Facility*, 134 F.3d 948 (9th Cir. 1998),

underscores why we must reach the merits here. Selam was represented by a lay Tribal Spokesperson who mounted a diligent defense notwithstanding Selam's unwillingness to assist. *See id.* at 950. When Selam lost at trial, "the tribal court judge informed Selam that he could appeal his convictions to the tribal court of appeals." Nothing of the sort happened here. What's more, Selam did appeal, and raised six grounds of error, "indicating that he did not consider his appeal futile." *Id.* Selam was in much the same position as the Community here with respect to exhaustion: He made a deliberate choice to raise some claims but not others. Consequently, we declined to excuse his failure to exhaust additional claims presented for the first time in his habeas petition. Why are we treating the Community here better than we did Selam?

The majority effectively holds that a defendant's right to federal habeas review under ICRA is always and entirely supervenient on his compliance with tribal procedure, no matter how fundamentally unfair that procedure may be. *Cf. Lee* v. *Kemna*, 534 U.S. 362, 375 (2002) (state prisoners are entitled to federal habeas review when their procedural default is the result of inadequate state procedures); *Hoffman* v. *Arave*, 236 F.3d 523, 531 (9th Cir. 2001) (federal habeas review is not precluded unless "the defendant has had a reasonable opportunity to have the issue as to the claimed [federal] right heard and determined by the State court") (internal quotation marks omitted). And, unlike state prisoners, those convicted by a tribal court who miss their appeal deadline will be permanently barred from federal court even if there is both "cause" and "prejudice" for their failure to exhaust, and even if such a result is a "fundamental miscarriage of justice." *Cf. Coleman* v. *Thompson*, 501 U.S. 722, 750 (1991) (claims not presented to a state court will not

be defaulted if "the prisoner can demonstrate cause for the default and actual prejudice . . . or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice."); *Franklin* v. *Johnson*, 290 F.3d 1223, 1231 (9th Cir. 2002) ("If a petitioner failed to present his claims in state court and can no longer raise them through any state procedure, state remedies are no longer available, and are thus exhausted"). It's particularly inequitable to treat tribal prisoners so much worse than their state counterparts in light of the fact that there is no right to counsel in tribal courts. Under the majority's rule, uncounseled tribal defendants subject to flagrantly unlawful convictions and fundamentally unfair procedural bars can nonetheless be prevented from obtaining federal habeas review. No other category of person subject to criminal jurisdiction in the United States gets anything close to such shabby treatment.

Moreover, the majority's holding permits a tribe to effectively nullify section 1303 of ICRA through artful manipulation of its courts' appellate procedures. A tribe could, for example, create a five-minute time-limit to appeal a tribal court's decision and, under the majority's newly minted rule, a prisoner's failure to comply would constitute a permanent bar to federal habeas relief. By establishing mandatory dismissal of unexhausted claims, the majority implicitly blesses the legitimacy of even such absurdly truncated time requirements.[3]

---

[3] The majority maintains that failure to exhaust can be excused when "exhaustion would have been futile or [] the tribal court of appeals offered no adequate remedy." Maj. Op. 11. But since the majority holds that futility and/or lack of remedy must be present at the time the tribal appeal *could have been* filed—rather than the time at which the federal petition is filed—these exceptions are practically worthless. Even a five minute (or thirty-second) appellate window still technically offers an "adequate

The majority reserves the possibility that ICRA's due process clause might offer a defendant some protection in "an extreme case." Maj. Op. 15 n.7. But how is this not an extreme case? Alvarez's situation is arguably worse than a defendant subject to a five-minute appeal window—his compliance with tribal procedure was practically impossible, given not only the short deadline, but his absence of counsel, lack of notice and inability to access even rudimentary legal materials. If ICRA's due process provision doesn't apply to Alvarez, I fail to see how it will apply to anyone. By denying federal habeas review in even the extreme circumstances present here, the majority renders ICRA's due process protections chimerical, and places tribe members' capacity to vindicate their federal rights entirely at the whim of their tribes. That's hardly faithful to the delicate balance between individual and group rights Congress sought to maintain when enacting ICRA.

Finally, even if a direct appeal within the Community court system were a meaningful remedy, we should still decline to enforce the exhaustion requirement because any marginal benefit it provides in terms of "preserv[ing] and strengthen[ing] tribal institutions," *St. Marks*, 545 F.2d at 1189, is far outweighed by the need to adjudicate the serious deprivations of rights that Alvarez alleges. *See* pages 37–38 *supra*. As we have repeatedly held, "[t]he exhaustion requirement is not an inflexible one." *St. Marks*, 545 F.2d at 1189; *see also Cobell*, 503 F.2d at 793; *Selam*, 134 F.3d at 953. If the majority *had* any discretion to exercise, it abuses it by refusing to exercise it in Alvarez's favor.

---

remedy" which is not "futile." The issue is not whether a tribal remedy theoretically exists, but whether a prisoner can meaningfully avail himself of that remedy.

## II

Alvarez claims that he was denied his jury trial and confrontation rights. *See* 25 U.S.C. § 1302(a)(6), (10). Although the majority sees no need to give his allegations anything more than passing mention, a closer look at Alvarez's trial and conviction reveals the serious wrong he has suffered, and the high price he has paid as a result.

## A

**1.** ICRA provides that "[n]o Indian tribe in exercising powers of self-government shall deny to any person accused of an offense punishable by imprisonment the right, *upon request*, to a trial by jury of not less than six persons." 25 U.S.C. § 1302(a)(10) (emphasis added). As with the Community's nonexhaustion defense, this jury trial right may be waived by "an *intentional* relinquishment or abandonment of a *known* right or privilege." *Johnson*, 304 U.S. at 464 (emphasis added). Whether this standard is met "depend[s], in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused." *Id.*

According to the Community, it was obligated to provide Alvarez only with a right to a jury trial as defined by ICRA, and ICRA provides for a jury only "upon request." The Community therefore argues that its obligation to provide a jury wasn't triggered until Alvarez made such a request. But the Community fails to explain how Alvarez would have known that he was required to make a request. Its theory seems to be that Alvarez must be presumed to know the law, including every jot and tittle in ICRA. But if we presume that kind of knowledge, what's the point of informing criminal

defendants of *any* rights? The presumption in criminal cases is precisely the reverse: Defendants *don't* know their rights and so we must tell them.

Alvarez was never told he had to ask for a jury. The Community produced the affidavit of Carleton J. Giff, who prosecuted Alvarez in the Community court. Giff states that a "'Defendant's Rights' form was routinely stapled to each criminal complaint provided to the defendant prior to arraignment," and notes that "the rights would have been routinely read at the beginning of each arraignment docket." This speaks only to the Community's general practice, not to what happened in Alvarez's case. Giff does not produce a copy of Alvarez's Complaint with a rights form attached, nor does he claim he remembers that Alvarez was apprised of his rights. And the Defendant's Rights form Giff attaches to his affidavit says only "[y]ou have the right to a jury trial." It does not tell defendants that they must *ask* for a jury, or when and how they must do so.

A transcript of Alvarez's arraignment has the judge saying that Alvarez had been informed of his legal rights, and asking if Alvarez had any questions about them, to which Alvarez answered that he did not. But there is no reference to *which* rights he was informed of and in what terms. How would a man with a seventh-grade education have known whether he was advised of all of his rights, or whether they were stated fully and accurately? And why wasn't Alvarez advised of his rights on the record by a judge rather than off the record by an unidentified nobody?

We advise defendants of their rights because we presume they don't know them. Judges perform the advisement to impress defendants with their importance. And we do it on

the record so we can later confirm that nothing was omitted or misstated. Are tribal courts so disdainful of defendants' rights that such formalities are routinely omitted? This, after all, was not traffic court; Alvarez got eight years behind bars.

The most we can infer on this record is that someone may have read Alvarez some rights, not whether they were all read or whether they were accurately stated. And the judge himself only explicitly mentioned one right: "Mr. Alvarez, sir, you may be eligible for counsel through Four Rivers Indian Legal Services. If you are not eligible, you will be responsible for obtaining counsel on your own. And this will then be at a cost to you." Counsel for the Community conceded at oral argument before us that we have no evidence that Alvarez was actually advised of any other rights.

Clearly, the means of invoking a right—and even the fact that a right must be specifically invoked—is critical information for a defendant planning his defense. There is no legitimate reason for the Community's systematic failure to advise defendants that they must request a jury if they want one. By failing to address the issue in this case, we are allowing the Community and perhaps other tribal jurisdictions to continue to deprive countless defendants of their right to trial by jury.

**2.** When the Supreme Court first held that the Sixth Amendment jury trial right was waivable, it was careful to defend its decision against those who feared that uninformed and unsophisticated defendants may waive their right to a jury against their best interests. Acknowledging that the right at common law was not waivable, the Court pointed out that the modern rule is a product of changes in the broader criminal justice regime: "Such a course raised up a sort of a

barrier which the court could utilize when a prosecution was successful which ought not to have been successful, or when a man without money, without counsel, without ability to summon witnesses, and not permitted to tell his own story, had been unjustly convicted, but yet under the ordinary principles of waiver, as applied to civil matters, had waived every defect in the proceedings." *Patton* v. *United States*, 281 U.S. 276, 307–08 (1930). It was plausible to permit waiver under the modern regime, however, due to the emergence of other procedural protections: "The man now charged with crime is furnished the most complete opportunity for making his defense. He may testify in his own behalf; if he be poor, he may have counsel furnished him by the state, and may have his witnesses summoned and paid for by the state." *Id.* at 308. But no such protections were afforded Alvarez; the Community court seems to be much closer to the rough and tumble justice of the common law courts.

While ICRA spells out what rights are to be accorded criminal defendants in tribal courts, it doesn't specify how those rights are to be invoked or waived. Congress left that to judicial interpretation. In performing that function we must take into account the practical realities of the tribal-court proceedings, including the fact that many defendants are forced to represent themselves. Although some of the rights provided by ICRA are more deferential to tribes than the Bill of Rights, the Act nevertheless seeks to "'protect individual Indians from arbitrary and unjust actions of tribal governments,'" in light of the fact that "the most serious abuses of tribal power had occurred in the administration of criminal justice." *Martinez*, 436 U.S. at 61, 71 (quoting S. Rep. No. 841, 90th Cong., 1st Sess., 5–6 (1967)).

It is hardly an intrusion on the sovereignty and integrity of tribes to require that they inform defendants of the full nature of their rights, including when and how they must invoke them. Insisting that tribes do so advances tribal sovereignty by ensuring that these issues are fully and fairly litigated within the tribal system rather than having them show up on our doorstep after a defendant has fully served his sentence. Happily, this is a case where both legislative interests—respecting tribal sovereignty and protecting the procedural rights of defendants—point to the same answer.

The denial of the right to a jury trial is a structural error requiring automatic reversal of a conviction. *Sullivan* v. *Louisiana*, 508 U.S. 275, 281 (1993). Moreover, the Community has never alleged that the denial of a jury in Alvarez's case was harmless, despite raising such a defense with respect to his confrontation claim. *Cf. O'Neal* v. *McAninch*, 513 U.S. 432, 444 (1995). Accordingly, we must vacate Alvarez's conviction.

## B.

Alvarez also claims that the Community court violated his right to confrontation when it admitted the complaining witness's statements through the testimony of Officer Benally. ICRA provides that "[n]o Indian tribe in exercising powers of self-government shall deny to any person in a criminal proceeding the right . . . to be confronted with the witnesses against him." 25 U.S.C. § 1302(a)(6). Because this mirrors the Sixth Amendment guarantee that "the accused shall enjoy the right . . . to be confronted with the witnesses against him," we may apply caselaw interpreting the federal constitutional right to its ICRA analogue. *Randall* v. *Yakima Nation Tribal Court*, 841 F.2d 897, 900 (9th Cir. 1988)

("Where the rights are the same under either [the federal or tribal] legal system, federal constitutional standards are employed in determining whether the challenged procedure violates [ICRA].").

Alvarez's trial occurred before the Supreme Court decided *Crawford* v. *Washington*, 541 U.S. 36 (2004), so his confrontation claim must be evaluated under *Ohio* v. *Roberts*, 448 U.S. 56 (1980).  In that case, the Court held that out-of-court statements could be introduced at trial only if the declarant is unavailable and the statements bear adequate indicia of reliability.  *Id.* at 66.

The district court did not assess whether the Community court violated Alvarez's confrontation right, instead relying on its conclusion that any error that may have occurred was harmless because Alvarez confirmed the truth of the out-of-court statements.  This logic is dubious:  Alvarez only affirmed that "everything that [Officer Benally] says it be true," *following and in response to* the alleged confrontation violation.   And as the prosecutor stated at trial, "the statements on the record of the defendant . . . are not evidence," and the "only things that could be considered by the Court is what is testified to."

*Roberts* observed that "[a] witness is not 'unavailable' for purposes of the  .  .  .  exception to the confrontation requirement unless the prosecutorial authorities have made a *good-faith effort* to obtain his presence at trial," and that "[t]he lengths to which the prosecution must go to produce a witness . . . is a question of reasonableness."  *Id.* at 74 (citations omitted).  In this case, the lengths to which the prosecution went to produce the victim consisted of issuing a subpoena, which was "left at the party(ies) usual place of

abode with a person of suitable age and discretion who resides at the party(ies) usual place of abode." The Community argues that this is sufficient to show unavailability because it is all that the Community's own laws required it to do, but this is untenable under *Roberts*, which speaks in terms of "good-faith effort" and "reasonableness." If dropping off a subpoena at a witness's home were enough, the good-faith effort and reasonableness requirements would be meaningless.

Officer Benally testified that when a prosecution witness fails to appear, "[s]ometimes they'll do a continuance or warrant or whatever they see is appropriate, depending on the circumstance," including, in some cases, prosecuting witnesses for failing to respond to a subpoena. The record reflects no such efforts in Alvarez's case. Neither the prosecution nor the court went to *any* trouble to bring the witness into court. The trial was not continued when the victim of the alleged crime failed to appear. No bench warrant was issued; no constable was sent to bring her into court. Confronted with an uneducated defendant who had no one trained in the law to speak for him, the court and the prosecutor took the easy way out by conducting a trial based on hearsay.

The fact that the Community court let the prosecution get away with such tactics doesn't mean that they were reasonable, much less that they represented a good-faith effort to produce the witness. *See Wilson* v. *Bowie*, 408 F.2d 1105, 1106–07 (9th Cir. 1969) (finding that a witness was not unavailable when "the only explanation given by the State . . . for [the witness's] absence was the prosecution's statement that it had attempted to subpoena [him]," and "there was no showing that [the witness] could not appear in court on

another day"). Indeed, knowing Alvarez's lack of sophistication and the potential value of having his victim testify, the prosecution had an even greater duty to ensure that she was present at Alvarez's trial. The Community court certainly did.

Although it's perfectly clear that the Community violated Alvarez's confrontation right by admitting the hearsay testimony of Officer Benally, a separate question remains as to whether the victim's statements introduced through her brother, which were largely duplicative of Officer Benally's testimony, fell within a hearsay exception, potentially mooting the confrontation issue. *See White* v. *Illinois*, 502 U.S. 346, 356 (1992) (holding that unavailability need not be shown under *Roberts* when the hearsay statement falls within a hearsay exception providing sufficient inidicia of reliability). Because we must reverse on jury trial grounds, this issue needn't detain us. Were this case to be retried by the Community, however, and should the victim once again fail to appear, the tribal court would have to consider whether the testimony could nevertheless be introduced under the standards of *Crawford*.

### III

The majority errs in dismissing this case sua sponte based on Alvarez's failure to exhaust his direct appeals in the Community court. Proceeding to the merits of Alvarez's petition, I would find that the Community violated Alvarez's right to a jury trial under ICRA by failing to inform him that he needed to request a jury. This was a structural error fatally undermining the conviction. Accordingly, I dissent.